## Cox *vs.* The State of Georgia.

1. Upon a showing for a continuance of an indictment for murder, one month and a half after the occurrence of the homicide (the prisoner having been painfully wounded by the deceased in the rencounter), whether the excited state of the public mind is such as to prevent a fair and impartial trial, and also whether the prisoner's condition, physically and mentally, has been such as to fit him for communicating sufficiently with his counsel, and otherwise preparing for his defence, and whether it is such as to enable him to undergo, with needful strength, composure and vigilance, a trial for his life, are questions addressed to the sound discretion of the presiding judge; and mere strictness in the exercise of the discretion and in over-

ruling the showing, not amounting to abuse, will furnish no ground for a reviewing court to interfere.

2. Jury commissioners, in fact acting as such, and recognized by an order of court filling a vacancy in the board, though not naming its members, and also recognized by adopting in practice the list which they have prepared and filed, are commissioners *de facto*. if not *de jure ;* and that no order of their appointment appears on the minutes, will not, on a trial for felony, be cause of challenge to the array put upon the prisoner. Nor is it a cause for such challenge, that in selecting tales jurors, the sheriff consulted the list and took names therefrom in the alphabetical order in which they stand on the list, confining the selection first to names all beginning with one and the same letter. There is no statute putting on the sheriff any restriction as to what he shall take for a guide in fixing upon the particular persons whom he will summon as tales jurors, so that they be qualified to serve.

3. When a juror, after answering the prescribed statutory questions so as to appear *prima facie* competent, is put upon the presiding judge for further trial of his competency, the judge may decline to allow any other questions to be propounded to the juror, and may confine the investigation to evidence *aliunde* and its effect.

4. Though a witness may know that there was some indistinctness in his hearing as to the words or the sense of a particular statement, he may testify to its substance as he understood it, and his doubt as to whether he heard correctly will only detract from the force and value of his testimony, not render it incompetent as inferential rather than immediate and direct.

5. Stenographic notes of testimony taken down at the coroner's inquest, and afterwards written out in ordinary character, may, upon due proof that the writing is a correct minute of what the witness testified, be read to show contradictions between that testimony and the testimony detailed by the witness from the stand, he being first examined on the alleged discrepancies, and his attention called to the same. An objection to the introduction of the paper, or to the reading of its contents, on the ground that ''it was not sufficiently shown that the said (witness) had sworn before the coroner as appeared from this written report of his evidence, and that he could not be impeached by such written report of his evidence," will not raise the question whether only certain parts of the contents, and not the whole, should have been submitted to the jury.

6. Where there is a mutual agreement to arm and fight, and the parties separate and arm with pistols, and they meet within an hour, and fight with the pistols, all pertinent acts and declarations of either in the interval belong to the *res gestæ* of the hostile enterprise.

7. Acts are pertinent if they are done pending the enterprise, and whilst it is in continuous progress to its catastrophe, and are of a nature to

promote or obstruct, advance or retard it, for to evince essential motive or purpose in reference to it; and declarations are pertinent if they are uttered contemporaneously with pertinent acts, and serve to account for, qualify or explain them, and are apparently natural and spontaneous.

8. Generally, when part of a conversation has been introduced in evidence, the rest of it may be brought out by the opposite party on cross-examination of the witness. The prisoner having proved that the deceased applied for the loan of a pistol, about twenty minutes before he was killed, together with a part of what he said at the time, the balance of what he said at the same time and place and in the same conversation was within the rule, and if not admissible on the principle of *res gestœ*, was admissible as the remnant of a conversation opened up in the direct examination of the witness.

9. Conceding that certain declarations made by the deceased whilst hostilities were pending, and within twenty minutes of the fatal collision, were so much in the nature of narrative, or mere recital, as to be of doubtful admissibility, or even inadmissible, on the principle of *res gestœ*, yet, where the same declarations in substance have been put in evidence as a part of a conversation into which the prisoner entered during the direct examination of his own witness, (the balance of such conversation coming out on the cross-examination), and where the prisoner has himself proved substantially the same declarations on the part of the deceased by another of his witnesses, or the state, without objection, so far as appears, has proved them by one of its witnesses, the subsequent admission of evidence to the same effect from another witness in behalf of the state is not necessarily cause for a new trial. If the jury already have before them doubtful or objectionable matter, and there is no motion to withdraw it, the repetition of it by another witness, though objected to, may be treated as not sufficiently material to require a new trial.

10. Where the evidence indicates that the homicide was the sequel to a concerted and pre-arranged scheme on the part of both combatants, to arm and meet for mortal combat, the court may, as a starting point for further instructions, charge the jury as to the legal consequences of such a combat resulting in death, though the evidence shows that after arming one of the parties ceased to intend, and the other ceased to expect a meeting at the place appointed, and though no meeting occurred at that place, and the scene of the rencounter was, without any express concert, shifted to another place in the same neighborhood.

11. In relation to whether there was not a consent of both wills, or a mental concurrence between the parties, in meeting when and where they did, though it was a little later than they had contemplated, and at a different place from that expressly agreed on, and conse

Cox *vs.* The State.

quently whether the actual collision was not in its nature the same as that which had been pre-arranged, with no change except in the scene and the precise time of the combat, the evidence admitted of two constructions; and for this reason, also, such a charge as that mentioned in the next preceding note was not inapplicable to the case. Where two views are fairly possible to be taken of the evidence, one that notwithstanding variations in time and place from the original scheme, and notwithstanding an apparent abandonment of the scheme itself, for a short interval, there was finally a return

it, and an execution of it in its main elements; and the other, that the meeting, at the time it took place, was designed by one of the parties only, and the other did not desire or intend it, it is allowable to submit to the jury the law of each of these states of fact.

12. The charge of the court, like all other deliverances in human language, is to be construed together as one whole, and when one part of it plainly tempers and modifies another, and the ultimate sense and impression are correct, the true standard of practical sufficiency is attained. As long as jurors are sworn to render a true verdict, according to evidence, it cannot be error for the court to instruct them to do so; at the same time telling them to give such force to the prisoner's statement as they think proper. The statement may aid them in ascertaining what the true significance of the evidence is, but for the jury to render a verdict in conflict with the evidence because the statement conflicts with it, would be to lose sight of the terms of their oath.

13. The court committed no error in denying a continuance, no error in organizing the jury, no material error, if any at all, in admitting evidence. Nor did it commit any material error in charging the jury. The charge, as a whole, was sound in doctrine, clear and concise in statement, fair in tone and spirit, both to the state and the accused, applicable throughout to the facts in evidence, and accommodated to each and every theory of the prosecution or the defense which the testimony afforded any warrant for considering.

14. The verdict was justified by the law and the evidence, and was not contrary to either. There was no error in overruling the motion for a new trial.

WARNER, Chief Justice, dissented.

Criminal law. Murder. Continuance. Jury. Witness. Evidence. *Res gestæ*. Charge of Court. Prisoner's statement. New trial. Before Judge HILLYER. Fulton Superior Court. April Term, 1879.

Cox was placed on trial for the murder of Alston, alleged to have been committed on March 11, 1879. The indict-

ment was found on April 3d following, and the case called for trial on the 29th of the same month. The defendant moved in writing for a continuance, because he was advised and believed that he could not then obtain a fair and impartial trial, on account of the great excitement and prejudice against him in the public mind of the people of Fulton county ; that this prejudice was engendered in the public mind, and still exists to an " increased extent," in consequence of partial and *ex parte* statements made in the public press in said county, which were exhibited to the court. That in consequence of the serious and dangerous wounds received by this defendant, and his close confinement in jail, and by reason of his great mental and bodily suffering, he has been unable to make the necessary corrections, and meet and overcome this undue prejudice and public excitement, and to confer with his counsel fully in relation to his defense.

Affidavits were filed both for and against the motion, from which it appeared that the excitement in the county did not extend beyond that which would be produced upon the unexpected homicide of any prominent citizen who had many warm personal friends in the community ; that whilst defendant was wounded by a shot through the wrist, which also passed through his mouth, carrying away some of his teeth, and imbedding one of the teeth in his tongue, he was by no means in a dangerous condition, and in fact had had many and frequent consultations with his counsel, some of them lasting for hours. It was shown by two witnesses that more than a week before the trial he said he was well, and ready and anxious for trial, and did not want any delay.

The newspaper articles were mainly regrets on account of Alston's death, portraying his many good qualities of head and heart, his desire to avoid the difficulty, his gallant bearing when it was forced on him, and expressive of the deepest sympathy with his bereaved widow and children.

The motion was overruled. [1st ground of the motion for new trial.]

The defendant pleaded not guilty. When put upon him, he challenged the array of forty-eight jurors on the following grounds :

1st. Because there was no order of the judge of the superior court of this circuit appointing three commissioners to revise the jury list of the county, as required by the statute.

2d. That by the order of Judge Hillyer, entered on the minutes of the court, only one commissioner was appointed for the purpose aforesaid.

3d. That the jury list of said county not having been revised as required by law, the sheriff had no legal authority to summon said panel of jurors, and said array ought not to be put upon defendant.

4th. Because the sheriff did not summon said panel from the body of the citizens qualified and liable to jury duty, but took an alphabetical list of names from the jury list and served them alone.

In support of the challenge, the following order was read from the minutes :

"STATE OF GEORGIA—County of Fulton :

It appearing to the court that Clinton I. Brown has resigned his position as commissioner to revise the jury box of said county, and said resignation being duly accepted it is ordered that James R. Wylie be, and he is hereby, appointed as one of the commissioners to revise the jury list and boxes of the county aforesaid, and said James R. Wylie has appeared and duly sworn and qualified as required by law.                                        GEORGE HILLYER,

December 28, 1878.                          *Judge S. C. A. C.*"

Upon demurrer by the prosecution, the challenge was overruled. [2d ground of the motion for new trial.]

The evidence presented, in brief, the following facts :

The homicide occurred in the office of the treasurer of the state of Georgia, at the capitol building, in the city of Atlanta, at about half-past three o'clock on Tuesday afternoon, March 11, 1879. On the Saturday preceding, defendant received a letter from Calhoun, Alston's law partner, requesting him to come to Atlanta at once. He came

in response to this letter, arriving in the city on Monday morning. Defendant had rented a plantation from Gen. Gordon, in Taylor county, where he then was, the latter agreeing to furnish sixty convicts to cultivate it for the term of eight years, for which (the plantation and the convicts). defendant was to pay him annually fifty bales of cotton Gordon wished to dispose of his interest in the lease of convicts, and to do so had to negotiate with Cox for the purpose of getting rid of his incumbrance. One Walters had been corresponding with Gordon in reference to buying his interest, and came to Atlanta about the same time that defendant did, for that purpose. He had written to Gordon that he would not buy at all subject to defendant's incumbrance. Gordon had telegraphed to him on the preceding Thursday, that deceased would leave Washington on Saturday to come to Atlanta, and that he had full authority to transfer his (Gordon's) interest. Walters came to Atlanta for the purpose of purchasing that interest. He arrived early Saturday morning, met Alston at the train later in the day, had a ten minutes' conference with him, and determined to remain over until Monday morning. All three, defendant, deceased and Walters, met in the office of Nelms, principal keeper of the penitentiary, on Monday morning at from nine to ten o'clock. They discussed the matter of the sale of Gordon's interest in a friendly way. Deceased disclaimed any intention of selling defendant out, but stated that he proposed to sell the Gordon interest subject to his incumbrance. On being asked by deceased whether he would not dispose of his interest, defendant replied that he would sell anything in the world he had except his wife and his children, and nobody wanted them. After some conversation the parties separated, and Walters commenced negotiating with defendant for his interest, desiring to purchase in order that he might trade with deceased. They finally came to an understanding and went off to find deceased, but when found, he said it was too late, as he had sold to Howard for $4,000.00, subject to defendant's lease.

This was on Monday afternoon. That evening Walters employed D. P. Hill, Esq., to help him make the trade, and the next morning (Tuesday, the day of the homicide), Hill went to the office of deceased, and the latter said that if Howard did not raise the money by twelve o'clock Walters should have the contract. Defendant and deceased came into the city on the same train that morning, the former having boarded it at Decatur, and the latter at Kirkwood. They appeared perfectly friendly, were seen on the streets of Atlanta walking arm-in-arm, and there was no reason to suppose that there had been any interruption of the intimate relations which usually existed between them. About half-past two o'clock, defendant was in a saloon with some friends taking a drink, when deceased came in. Defendant asked him to join them. He declined to drink, but at the suggestion of defendant took a cigar. Defendant said to him that he wished to see him, and they walked out of the barroom arm-in-arm, and went into the back-room of a neighboring barber-shop, on Marietta street, 150 or 200 yards from the scene of the homicide.

Up to this time there was probably no ill-feeling on the part of defendant to deceased, but he seemed excited about the pending trade, fearful lest his interest should be prejudiced in some way, and possibly apprehensive lest what appeared to be an opportune occasion of selling out his lease of, or interest in, the convicts, should be lost.

What occurred in that back room of the barber-shop can only be known through the declarations of deceased and of defendant made in the interval before the homicide, not exceeding an hour, and probably less, the acts of the parties during that short period, and the statement of the defendant on his trial. One of the main grounds of controversy be fore this court was the admissibility of some of these dec larations.

Deceased went from the barber-shop to the treasurer's office, and thence up stairs to Nelms' office, in the capitol, this office being on the second floor of the building. Nelms

upon his direct examination for the defense, testified as to what passed there, as follows: "It was probably three o'clock in the day that Col. Alston came in and asked me for a pistol, and I said mine was at home shot out, and I asked him what he wanted with it, and he said he had liked to have had a difficulty, and I said come in and tell me about it, and he came in and sat down. I asked him who it was with, and he said it was with Ed. Cox, and told me about it."

On cross-examination, when counsel for the prosecution asked witness, "What did he (Alston) say?" alluding to the conversation where it was left on the direct examination, it was objected that the declarations of Alston in the absence of the defendant were inadmissible, and also that the evidence sought to be introduced by the question propounded was but part of a conversation. The court allowed the question asked, and stated that the defense was entitled to all the conversation. [7th ground of the motion for new trial.]

The examining counsel then said to the witness, "state all that conversation," and the witness answered thus: Deceased said, "Why Nelms, he carried me in to take a drink with him. I took this cigar. (He had a cigar in his hand at the time.) And then he took me into the back-room of a barber-shop, shut the door, and said, 'Bob, I want to see that power of attorney you have to sell Gordon's interest,' and I said, 'I would not show it under compulsion,' and Cox said, 'I am going to see it before you leave this room,' and I said, 'Ain't you a nice great big rascal here with your knife, when I have not got a piece of steel on me, to try to force me to terms.' And he (Cox) said, 'Go arm yourself, and I will wait for you.' He is waiting for me now." He asked me again for a pistol, and witness said his pistol was at home. That was about all he said to me, and witness began to talk to him, and said, "Alston, there is no need of a difficulty between you and Cox, you are both friends, and let me attend to this matter, and be a mediator. You are

not here to interfere with Cox," and he said, "No! But he has an idea that I am here to sell him out." Witness said, "You wait, and let me be a mediator," but he did not wait, and got up and started down to the treasurer's office.

As to what transpired in the barber-shop, substantially the same facts as testified to by Nelms, were subsequently proved, without objection, by Howard, a witness for the state, and by Gov. Colquitt, a witness for the defense, on examination by defendant's counsel.

At the treasurer's office, within not exceeding twenty minutes of the homicide, Murphy, from whom deceased borrowed a pistol, over the objection of defendant, testified to the following conversation: "I am certain I didn't notice Mr. Sams; I think most likely I was at the cash-drawer; I am frequently called to the cash-drawer. I occupy the middle room and Renfroe the rear room; I did not notice Sams when he came in. When I walked up Mr. Howard had got in, in the meantime, and Mr. Sams had delivered a message to Mr. Alston, and when I got back to them I heard Sams say he regretted very much to be the bearer of such a message, and he was in hopes very much that he should not be able to find Mr. Alston, then they had some other conversation that I did not understand. Mr. Howard arose from his seat and started to walk in the passage way out, and as he reached the middle door he said, 'don't let us let Alston go down there, Cox has sent after him, and don't let us let Alston go down there,' and I said, 'Of course not,' and he had agreed not to go, but I saw that Alston was excited. In the conversation before, he had sorter cooled off, and we called him and told him he ought not to go. I said, 'You have a family and Cox has one. You say Cox has got no cause for a difficulty, and let him cool off and he will see it.' He said, 'What shall I do?' and I said, 'Send him word that you have reconsidered the matter, and that you will not go, for him to go his way and you will go yours.' He went back and set down on a seat next to Forsyth street, and Sams was in a seat near Renfroe's room.

Alston said to him, 'You go back and tell Mr. Cox that I have reconsidered the matter, and am not coming down there. There is no cause for a difficulty between us; for him to go his way and I will go mine. He attend to his business and I will attend to mine.'"

Defendant's objection was that this was a conversation not in the hearing of the defendant, and in no way connected with the encounter between the deceased and defendant. [9th ground of the motion for new trial.]

The conversation between Sams and Alston, as testified to by Murphy, had already been proved by Howard and Renfroe, witnesses for the state, by the former without objection, and by the latter over objection on the part of defendant, and also by Sams, a witness for the defense, and whilst on the direct examination by defendant's counsel.

From the treasurer's office deceased went to Berron's saloon, about seventy-five or eighty yards from the capitol, on Forsyth street. The capitol is on the corner of Marietta and Forsyth streets, the main entrance thereto being on the latter. The treasurer's office is in the corner of the capital, (on the first floor) having windows opening on each of these streets. What transpired at Berron's will best appear from the testimony of Gov. Alfred H. Colquitt, a witness for the defense, and drawn out by defendant's counsel, as follows:

" I think I left home about three o'clock, or a minute or two after. On my return to the capitol I saw Cox crossing Forsyth street when I reached Berron's. I was seventy-five or eighty yards from him; it took me some four or five minutes to walk from my home to that place. Major Warren was with me when I saw Cox; Cox was walking rapidly in the direction of the entrance of the capitol on Forsyth street. He turned at the corner and went diagonally across the street; I did not see Cox go in; I did not see him any more after that that day. When I got to Berron's I met Alston there. I suppose I met him about the centre of the building; the front of the building I suppose is about forty feet; there are two doors to the building;

I don't know about the windows; he was coming up Forsyth street, I was coming down. There was nothing unusual in his manner; he was walking leisurely. Alston and I were standing there facing towards the capitol when I saw Cox crossing ; Alston was standing with his back to the wall and addressing me rather at my side, his face was nearer to the right, towards Marietta street. Alston did not go back with me to the capitol. I left him there. I was detained there about two or three minutes by the conversation with Alston. When I met him he remarked that since he had seen me he had been subjected to a very severe trial. He said that he had met Mr. Cox and Cox had invited him to take a drink, which he declined ; that he then invited him to take a cigar, which he accepted, and that they then walked out ; I did not pay close attention to whether he said it was in the same room or not. That then they walked together into a back room of some saloon, and that when they went in there Cox closed the door and said to him ' I want you to show me that power of attorney from Gordon—have you the power of attorney ?' Then he replied, 'I have,' and Cox said 'I want to see it, and I want you to sit down here and write a contract as I tell you under the power of attorney.' Then he replied that he would not be forced to do so. That he had already made some agreement about it and that he could not make any other without dishonoring himself, and certainly would not if such means were used forcibly. That then Cox drew a large knife and told him that he must make that contract. That he expostulated by saying 'you have taken the advantage of me, I am unarmed and you must let me out of this room,' and Cox replied 'I will do so if you will return here in ten minutes.' That the door was unlocked and he came out. That was the conversation he related as having occurred between him and Cox in the saloon. He then said 'I sent word to him that I had reconsidered it and would not go back ;' he said he was in doubt what to do ; he concluded he would not go and that he felt that he did not know but that it was

his duty to his family that he should take a double-barreled shot-gun and shoot him when he saw him. I told him may be he was regarding the matter in too serious a light; that I hardly thought there would be need of such appre-hensions as he supposed. He said, 'No, I am not mistaken, he is bent upon taking my life;' I think he then remarked, I don't know in what connection, perhaps in connection with the using the double-barreled shot-gun, that he had a pistol but that he thought he ought to take a double-barreled shot-gun. He staid there at Berron's, and said, 'I have had no dinner, and came over here to get my dinner,' with a view to explaining why he was there I suppose. When he made this last remark, 'I think he is intent on taking my life,' he called my attention to Cox who was crossing the street, and said, 'there he is hunting for me now with his hand on his pistol.' I thought from my view and the way his arm was bent, that he had his hand on his back hip-pocket, that was all; and I said, ' you go in here and get your dinner and come on; I will go to the capitol and see what I can do about it.' Alston was outside when I left. I did not look back; we parted and I supposed he was going in. I got a glimpse of Cox after that as he passed across the room where the secretary staid up stairs; I went straight up to my office by the Forsyth street en-trance, and did not stop anywhere; it was not very long be-fore I saw Cox pass; first Mr. Warren and I parted and I turned into my office, and he into the secretary's office. I told him to tell Mr. Nelms to come to me, and walked into the office and put my hat and cane down, and as I turned I saw Cox pass from the door there and through that into the room of the warrant clerk. Nelms came to me; I told him that Cox had just passed down and I want you to overtake him and prevent any difficulty if there is one likely to oc-cur. There is some quarrel between him and Alston, and I want you to look after that. He said there was a lady in his office with some matter she wanted to lay before me. I said that he must not delay, but go on and overtake Cox;

and he said he would get his hat and go, and went off rapidly. I saw him as he passed, four or five minutes afterwards. I heard the first shot. I went down after the shooting. When I met Alston in front of Berron's and we had the conversation about Cox, I told him to go in there so as to get time, and I wanted him to go in there so that he would feel that he went in there without any idea of dodging or getting out of the way for fear of any one."

Deceased went into Berron's, ate a cracker or two, went out and walked down to the treasurer's office.

Defendant went from the barber-shop to a neighboring saloon, endeavored to borrow a pistol from three different persons present, requested a friend to stand by him, as he was involved in a difficulty, went over to a gunsmith's shop in another portion of the city, bought a pistol, had it loaded and returned.

Woodward, a witness for the state, who was in the gunsmith's shop at the time, making some purchases, testified as follows: "He said something when he went out to the effect that he (Heinz, the gunsmith,) would hear from him soon. I can't be positive that he said these words, but if I had to swear what he said I would swear that he said these words rather than anything else; that is the substance of what he said. I would say that I did not hear distinctly enough, not that I did not recollect. He said, 'you will hear from me soon.' If he did not say that he said other words that amounted to the same thing. I say it is that rather than anything else."

Counsel for defendant moved to withdraw this evidence from the jury upon the ground that the witness had testified, not as to his recollection of what was said by the defendant, but as to his opinion of what he must have said.

The motion was overruled. [8th ground of the motion for new trial.]

On defendant's return from the gunsmith's shop, he met Hodgson and Sams, and one or both went with him to the back room of the barber-shop, where Sams remained but

two or three minutes. Then he went on the message to Alston, with the result as already detailed. In the meantime Nelms came to see defendant with the view of settling the matter in some way, but he declined in a polite way to have any conversation with him on the subject, stating that he was waiting to see a friend by appointment. Sams returned and delivered Alston's message to which defendant replied, "That is all right, but it does not suit me. I will go and see him." He then started towards the capitol. Sams endeavored to stop him, but he pulled away.

As he crossed Forsyth street he was seen by Governor Colquitt and deceased who were then standing in front of Berron's saloon. He went into the treasurer's office, walked rapidly out, and went up to the office of the principal keeper of the penitentiary where he found Nelms engaged with a lady. He said to Nelms that he wished to see him, asked where either Howard or Murphy was, took a seat by the window, and remained a few minutes. From that window he commanded a view of the crossing over which deceased passed on his return to the capitol from Berron's saloon. Nelms said to him that he was drunk, or something was the matter with him. He suddenly got up, went through the office of the private secretary of the governor, through that of the warrant clerk, and went down to the treasurer's office. The governor, who had just arrived at his office from Berron's, saw him pass, and sent his secretary immediately for Nelms, and told him to follow defendant and prevent a difficulty with deceased, as there was a quarrel pending between them. Nelms got his hat and followed him into the treasurer's office.

This office is composed of three rooms or subdivisions. The door by which one enters opens into a narrow passage with a high counter on the right and a partition wall on the left. Into this partition wall is a door opening into a water-closet. At the end of the passage-way is a glass door which closes itself by a spring unless hooked back. Passing through this door one enters a room 12x13 feet, with three

doors to it besides that of entrance, the first to the vault on the left; the second, immediately opposite to that of entrance, leading into another room, and the third to the right leading into the same back room near the Forsyth street wall. In the corner near this last door is the stove. The desk of the treasurer is located in the back room, so that from his seat in a revolving chair he can see through the last door; in fact, his chair is right at that door. Immediately opposite to his chair is the passage way behind the counter, to the money-drawer, etc. In the center room are chairs and a table, leaving but very little unoccupied space.

As defendant came down the steps towards the treasurer's office, deceased was seated in the middle room. He had a few minutes previously said to Renfroe, "This is an awful thing to have a man hounding you in this way." Renfroe said, "Did not you meet Cox?" He replied, "No! he has gone up-stairs hunting me." Then it was that Peter (a colored boy employed about the capitol) said, "Col. Alston, Cox is coming down the steps now," and deceased said, "Go and fasten that door," and Peter went to do so, and met Cox, who passed him and came into the room. (Renfroe had testified on cross-examination that when deceased came in he asked him if he did not meet Cox and he replied to him—here the witness stopped, and when examined in rebuttal by the state, gave the above conversation. Upon his direct examination, he being the first witness for the state, several times he was on the eve of giving this evidence, but on objection, counsel for the state did not then press the examination any further.)

Counsel for defendant objected to the above conversation between deceased and Renfroe because not in the presence of the defendant, and because had five or ten minutes before the rencounter. The objection was overruled. [6th ground of the motion for new trial.]

They also objected to the question propounded to Renfroe, which drew out the answer as to the sayings and actions of Peter, to-wit: "What was the reason that Colonel

Alston told Peter to shut the door?" on the ground that the answer would be a conclusion which could only be drawn by the jury after hearing the facts, and because this conversation between Peter and Alston was not in the hearing of the defendant.

The court said let the witness tell what he saw and heard, and the answer went in. [5th ground of motion for new trial.]

As defendant entered the middle door, with his right hand upon his pistol, which was so far drawn from his pocket as to be partially exposed to view, deceased rose from his chair and turned to meet him. Defendant said, " You promised to meet me down the street and settle this thing, why did not you do it?" Deceased replied, "Because I have reconsidered the matter and do not want to have any difficulty with you." Defendant said " I will brand you " something or other. Renfroe told them they could not have a difficulty there. Defendant answered, " very well," took hold of deceased's arm and said, " Come out and let us settle this difficulty outside." Deceased pulled back and would not go. Defendant moderated his tone and sat down in front of deceased. He said to deceased that he had wronged him ; had not treated him right, and he was going to make him do so. Deceased said, putting his hands upon the lappels of defendant's coat, in almost a playful manner, " Cox, let us stop this ; there is no use of having a difficulty ; I don't want to have any difficulty with you ; I don't want to kill you, and don't want you to kill me." Defendant said, " There is no danger of your killing me," rising from his seat and unlatching the hook which held open the middle door, and it swung to. He then said, " This thing has got to be settled here now." Renfroe put his hand on defendant and said he must have no fight in his office. Defendant quieted down again, and Renfroe sat down by his desk and commenced writing. Nelms then came rapidly into the room, and defendant again got up. Renfroe beckoned Nelms to him and said, " Don't let these men fight ; they

have been quarreling." About the time of Nelms' entrance, defendant rose from his seat, and as Nelms walked back from Renfroe's chair, defendant turned and took hold of the door knob with his left hand, exposing to full view the cylinder of his pistol which he held in his right hand. Deceased said, "Cox, are you going to shoot me, are you going to shoot me now?" at the same time rising from his chair, unbuttoning his coat, and walking towards the door of the back room at which Renfroe was seated, as if to pass in. As he rose defendant drew his pistol entirely from his pocket and walked on a parallel line to that of deceased. This threw Nelms between them. As deceased passed Nelms he looked over towards defendant, wheeled, drew his pistol and fired. Defendant fired almost simultaneously. Deceased stepping to his right, continued firing with great rapidity, being armed with a Tranter self-cocking weapon, enabling him to shoot as rapidly as he could pull the trigger. Defendant seemed astonished at the rapidity of the shots, kept springing to his right, holding up his left arm and hand to protect his head. The fourth shot passed through his left wrist, into his mouth and out through the back portion of his cheek, carrying away some of his teeth, and imbedding one in his tongue. After deceased's fifth shot, defendant straightened himself up from his crouching attitude which he had occupied during the firing, extended his right arm at full length, and blew the brains out of deceased, who stood facing death with an empty pistol in his hand. As soon as the tragedy was thus completed, defendant dropped his pistol saying, we are both dead men, and sank down into a chair. Whilst two other bullets went through his clothes he was only wounded as above described.

The evidence in the case was voluminous, and sometimes conflicting as to minor details, but it is believed that the above report presents a fair view of the testimony, certainly the view that was taken of it by the jury.

The court charged the jury as follows:

"*Gentlemen of the Jury :*

"The court will now deliver to you the law for your guidance and direction in reaching a verdict according to the evidence. In the beginning, I carefully call your attention to the statement that the court neither desires nor intends to express or intimate any opinion touching the evidence or touching any alleged or contested fact in the case. The court will state certain legal propositions to you in the alternative form, that is, both ways, and it will be for you to say in which direction, or in what direction the evidence points. Should you deem in any expression dropping from the bench that you detect any leaning in the mind of the court one way or the other, know that you are mistaken. It is the duty of the court to deal with the law; forth from the conscience of the court the law goes to you. The facts you receive alone from the evidence. You judge of both the law and facts, and they lead you to the truth.

"I will presently read and deliver to you certain sections of the Code. They relate to the definition of crime, the question of intention, and the law of homicide. I shall read these sections through to the end, without stopping for explanation. After reading them the court will make some further comment. These sections are couched in language singularly terse, expressive and forcible. Every word is pregnant with meaning, and it may be doubted whether any attempt at explanation or comment would not rather obscure than brighten the meaning, and if you find that the court does not comment or enlarge on all or all parts of these sections, the court desires you to understand that such of them or such parts of them, if any, as are applicable to the case, but not further specially noticed in the charge, are thus omitted from further mention for the reason that the court deems them sufficiently clear and plain as I now read and deliver them to you.

"Sections 4292, 4293, 4319, 4320, 4321, 4322, 4323, as amended by act of 1878, 4324, 4325, 4327, 4330 to and including the words 'commit a felony on either,' 4331, 4333, 4334, 4335.

"If you find from the evidence that the prisoner at the bar did, in the peace of the state, in this county, on the occasion, with the weapon and in the manner described and set out in the indictment, with malice aforethought, either express or implied, unlawfully kill the deceased, Robert A. Alston, and if the prisoner was then and there a person of sound memory and discretion, the offense of murder would be made out; otherwise the offense of murder would not be made out.

"A person would be presumed to intend the natural consequences of his acts. A person would be presumed of sound memory and discretion unless the contrary appear.

(1.) "(If two persons have a dispute about a matter of business, the law would not sanction a deliberate, premeditated and intentional resort on the part of either of them, or both of them, to deadly weapons for the

mere purpose of prosecuting or settling such dispute; and if pending such difficulty between them they mutually agree to separate and procure arms and to again meet for the purpose of engaging in a fight with deadly weapons, and if they do separate and each seeks and procures a deadly weapon, and they accordingly and by such mutual and previous design again and intentionally meet to fight with such weapons, and in a rencounter thus brought on, if one of them kill the other, the law would not justify the slayer, no matter which of them was right or which was wrong originally in such business dispute, and no matter which of them made the first proposal so to arm for such hostile purpos , nd no matter which fired the first shot or initiated the attack when the rencounter began; and it would be either murder or manslaughter in the slayer, according to the evidence, under the principles of law applicable thereto.)

(2.) "(It would be unlawful for two persons to deliberately conspire, or agree together to procure deadly weapons and meet again to fight therewith, and if in the heat of blood they do so agree, it would be the duty of both of them and each of them to heed the voice of reason and humanity if there was an interval sufficient for that voice to be heard, and to reconsider the matter and decline such hostile meeting, and if one of them does so reconsider and decline such meeting and the same be communicate t to the other, it would be the duty of that other to acquiesce therein, and if that other refuse so to acquiesce and persists in an original hostile purpose, and if pursuant thereto, he, armed with a deadly weapon, seek his adversary with a deliberate intention of bringing on such difficulty and of using such weapon therein notwithstanding the other's refusal, and if he does so bring on the contest, and in such difficulty he slay his opponent with that weapon, it would be murder in such slayer.)

(3 ) "(If at the time of the rencounter the prisoner was armed with a deadly weapon, and was the aggressor and the assailant, and if be by his conduct made it necessary for the deceased to defend his own life, if the prisoner manifestly intended or endeavored then and there to commit a serious personal injury on the person of Alston amounting to felony, then the deceased would be justified in defending himself, and even in firing first if he could, and the prisoner could not plead any danger, no matter how imminent the peril he may have been placed in by such countervailing attack, for his justification.  If the prisoner did thus, in his own wrong, unlawfully bring about a necessity for deceased to fire upon him, the principles of self-defense would not justify the prisoner in meeting that necessity by killing the deceased, but the law would attribute the killing to the original malice, and such killing would be murder.)

" But if upon a sudden occasion two persons fall out and presently fetc a weapons and mutually willing and consenting, fight therewith, and one of them slay the other in such sudden rencounter, then if the

slayer acted without any mixture of deliberation whatever but under the influence of that sudden violent impulse of passion, supposed to be irresistible, then his offense would be voluntary manslaughter only, and not murder.

"Or if the prisoner did not intend originally, or had not entered into any such purpose to fight with deadly weapons or to attack deceased therewith, or even though having such purpose at the beginning, or at any time, if he had in good faith abandoned such intention, and was not seeking deceased for such purpose, and the parties were again brought together without hostile design on the part of prisoner, and the quarrel unexpectedly to prisoner renewed, and, upon some new provocation, they suddenly draw weapons and mutually engage in a fight therewith, each consenting and willing so to draw and suddenly fight, and each knowing that the other is so willing and consenting, and if in a rencounter thus brought on, the prisoner slew deceased, it would be voluntary manslaughter only, and not murder. But if prisoner did not act in the fatal crisis upon any sudden provocation, or cause of defense, but from a previous and deliberate intention to bring on a fight with deadly weapons, and amounting to malice as before explained, and prisoner killed deceased under the same, then the law would not thus grade the offense from murder down to manslaughter. I have read and submitted to you the law of involuntary manslaughter of both kinds, and you are authorized to consider and pass upon and be guided by the principles there laid down, if applicable, and so far as you find the same to be applicable under the evidence

(4.) "(The law does not prescribe any particular duration of time in which an intention unlawfully to take life or to do a criminal act resulting in death shall subsist in the mind in order to constitute malice. There must be deliberation in order to make express malice, that is a succession in mental action—the unlawful intention—and then, following after the formation of that intention, the execution or carrying out of the same. If there was time for deliberation, if there was an interval between the assault or provocation given and the homicide, sufficient for the voice of reason and humanity to be heard, under the circumstances, in the conscience of a reasonable man, then it would be the duty of the prisoner to hear that voice; and if he had, and persisted in, an unlawful purpose to kill, through or during such an interval, there would be express malice; or, if no considerable provocation appear, and if all the circumstances of the killing show an abandoned and malignant heart, then malice would be implied. But if there was not such sufficient interval, there could be no express malice. If there was considerable provocation, or if all the circumstances do not show an abandoned and malignant heart, then malice could not be implied. The existence or non-existence of malice is, like all other such matters, a question for the jury to be judged of and determined by the evidence.'

"If the prisoner was not actuated by such fixed purpose to engage in and bring on a fight with deadly weapons, as I before described, or though previously having such purpose, if he had abandoned it, and if the prisoner was not the aggressor or the assailant, or if he in reality made no attack on deceased, and yet the deceased made an attack on him, the prisoner, with a deadly weapon, when there was no necessity to do so, then the prisoner would be justified in defending himself, even by taking the life of the deceased, and he would be guilty of no offense, and must be acquitted.)

" At the hazard of repetition, the court extends or further explains. some of these principles."

(The request to charge, made in writing by defendant's counsel, the court altered and amended, and delivered as follows :)

"First. Every homicide is not unlawful, and, as before stated, homicide is of three kinds, murder, manslaughter and justifiable homicide.

" Second. There can be no murder without malice, express or implied. One person may kill another against whom he entertains malice and yet not be guilty of murder, and whenever the circumstances of the killing would not amount to murder, the proof even of express malice would not make it a case of murder. It is in all cases for the jury to say whether all the elements necessary to make out guilt affirmatively appear in the evidence. If any of such essential elements be wanting, either malice or any other, an acquittal or reduction in the grade of offense must follow. If all be present a conviction would be the lawful result.

" Third. It would be justifiable homicide for one person to kill another ' in self defense or in defense of his person against one who manifestly intends or endeavors by violence or surprise to commit a felony on his person.'

"Fourth. To unlawfully discharge a loaded pistol at another within striking distance, and especially within a few feet, would be a felony, and that in this case, if the jury are satisfied from the evidence that Alston fired on the prisoner when he was under no necessity to do so for his own defense, and continued to fire at him (prisoner), then he, the prisoner, would have the right to return the fire, and to shoot and kill Alston to save his own life. '

" Fifth. If the jury believe from the evidence that Alston fired upon Cox when it was unnecessary to do so for his, Alston's, own defense, and if the circumstances attending the firing by Alston were such as to excite the fears of a reasonable man that the deceased was manifestly intending to shoot Cox, and if Cox, acting under the influence of those fears and not in a spirit of revenge, shot and killed Alston, it would be justifiable homicide, and he, prisoner, ought to be acquitted. But, as before stated, if the prisoner wrongfully provoked the difficulty, and wrongfully made it necessary for Alston to fire on him, and

V 64—25

if any necessity prisoner may have been placed under to kill deceased was a matter of his (prisoner's) own wrongful creation, then the principles of self-defense should not justify prisoner.

"Sixth. Should the homicide appear to be justifiable, the law declares that the person indicted shall upon the trial be fully acquitted and discharged.

"The prisoner begins the trial with the presumption of innocence in his favor, and this presumption remains with him to the end or until overcome by proof. The burden of proof is on the state to prove every material allegation throughout and to the end of the case, and upon all disputed questions and issues in it. In criminal cases a higher degree of certainty in the evidence is required than in civil cases. In a criminal case mere preponderance of evidence would not be sufficient to carry conviction upon any contested fact or question in issue. The evidence must be sufficient to carry in the mind of the juror conviction beyond all reasonable doubt. But a moral and reasonable certainty up to this standard would be sufficient. If the presumptions of innocence, and in favor of the prisoner, be overcome by proof up to this standard, then the conclusions carried by such proof would prevail over such presumption or presumptions.

"If upon the whole case or any essential element necessary to carry the case or make out guilt against the prisoner, you have a reasonable doubt, the law requires that you give him the benefit of that doubt and acquit him or reduce the offense to some grade lower than murder, as the nature of such doubt may require. The doubt here referred to is not a fanciful doubt, such as the mind would have to strain at, but a reasonable doubt rising naturally in the rational mind; this would be the doubt of the law ; nothing less would be.

"A writing relative to testimony alleged to have been given by the witness, Sams, on a former occasion was sent down to you not as original evidence, but only in connection with the testimony delivered on the stand here, and you will not look to that document as affording any inherent evidence of the truth of its own statements; but you look to it only so far as the evidence delivered orally here by Sams or other witnesses may bear on the question of whether that witness made any such contradictory statements, and in determining the effect of the same if there be such contradiction. But under the rules of law, as the writing itself does not properly go out with you to your jury-room, you charge your mind with it and remember it along with the other evidence in the case.

"It would be the duty of the jury to adopt any reasonable hypothesis that will explain and reconcile the testimony, so as not to impute intentional perjury to any witness. If in any particular or particulars the testimony may not be thus reconciled, you would give credence to that which most commends your belief in its truth.

"If a witness swear that which is false wilfully and knowingly, and

intending to speak that which is false, knowing it to be so, then his testimony ought to be discarded altogether, unless, or so far only, as corroborated by others and credible evidence, or by circumstances.

"The court does not say or intimate that any witness on either side has thus sworn falsely. All questions of conflict in the evidence and of weighing and passing upon the evidence, each witness in the case, the manner in which he testifies, the matter of his testimony, bias, prejudice, feeling, or the absence of these, are matters exclusively for the jury to inquire and pass upon under the testimony. In the testimony find the true facts and base your verdict on them.

(5.) "(A witness may be impeached by disproving the facts testified to by him, or by proof of contradictory statements previously made by him as to matters relevant to his testimony and to the case. A witness impeached by either method may be sustained by proof of general good character. The whole question whether any witness or witnesses be impeached or sustained, and the effect of the same, are, like all other questions of fact and of evidence, to be determined by the jury. There is nothing in this case but the law and the evidence. By these and these alone your verdict must be found. In the sacred precincts of the court house and the jury-box impartial justice must prevail. Take up this evidence, go through it all, fairly, calmly, without fear, favor, affection, reward, or the hope thereof, without bias or prejudice, with a mind open to the truth and willing to do right, and in that evidence alone under the law find the truth, and let your verdict be based on that truth only because it is the truth, and because both your oath and your duty require you to do so.)

(6.) "(The prisoner makes his statement before you not under oath. Such statement is not evidence to such extent as by itself would impeach the witnesses. If in any respect the statement conflict with the evidence, the statement should yield to the evidence. You judge of it in the light of reason, common sense, humanity and justice, considering the matter of such statement, the manner of its delivery in all its relations and in all his relations to the case and to the evidence. Reminding you that you have sworn to render a true verdict according to the evidence, the court distinctly tells you that the law vests you with a wide discretion in relation to the statement in question, and it would be your province to give the prisoner's statement just such weight, but such only, as you think right, be it never so much or never so little.)

"I read to you that clause of the Code regulating the punishment for murder as lately amended, and as it now stands in the law. Of course, if you do not find the prisoner guilty of murder, you will have no occasion to consider or pass upon the question of his punishment. But if you, under the law and the evidence, find the prisoner guilty of murder beyond any reasonable doubt, then it would be your province and your duty to say whether the punishment shall be by death or by confinement in the penitentiary for and during his natural life,

and the court will have no discretion in that matter after you have passed upon it. If you find in the case circumstances of mitigation not sufficient to bring the offense below murder and yet sufficient to lead you to the conclusion that such perpetual imprisonment would be an adequate punishment under the circumstances, and sufficient to vindicate the justice and sanction of the law, then you ought to make such recommendation, and thereby spare his life. But if you find no circumstances of mitigation, and further find it to be your duty to refuse such recommendation, then the law would leave the defendant to the penalty of death.

"If you convict the prisoner of murder, and further find it your duty to refuse such recommendation, then the form of your verdict would be: 'We, the jury, find the defendant guilty,' and that would mean guilty of murder—the highest offense charged in the bill of indictment, and the death penalty would follow. If you find the prisoner guilty of murder, and further find it your duty to fix upon the lesser penalty, then the form of your verdict would be: 'We, the jury, find the prisoner guilty and recommend that he be punished by confinement in the penitentiary for life,' and thereupon the court would give judgment according to that. If you find the prisoner not guilty of murder or guilty of that offense not made out beyond all reasonable doubt, you would acquit him of it, then you would pass upon the question of voluntary manslaughter, and if you find the prisoner guilty of that offense beyond all reasonable doubt, you would say: 'We, the jury, find the prisoner guilty of voluntary manslaughter.' Or if, either upon the evidence or the want of evidence, or upon a reasonable doubt, not guilty of manslaughter, and if you find the evidence requires it, you would be authorized to convict of involuntary manslaughter of either kind, and you would so express it in your verdict. If you find the prisoner not guilty, or guilt not made out beyond all reasonable doubt, then you would say: 'We, the jury, find the prisoner not guilty.' In either event let the verdict be written on the bill of indictment, date it, sign it by your foreman, and bring it into court."

The jury found the defendant guilty, and recommended that he be punished by imprisonment for life in the penitentiary. He moved for a new trial on the following grounds:

1. Because the court erred in overruling the written motion for a continuance.

2. Because the court erred in overruling the challenge to the array of jurors.

3. Because the court erred in refusing to allow defendant's

counsel to prove by Albert Howell, a juror put upon the defendant by the state, that he, the said juror, had formed and expressed an opinion, and still entertained a fixed opinion as to the guilt of the defendant from having read a report of the evidence taken before the coroner's inquest and published in the Atlanta *Constitution*, a newspaper published in the city of Atlanta, in said county, and other articles published in said paper in relation to the shooting of deceased by defendant, said juror having been put upon the court by the defendant to be tried as to his competency, said defendant being thus compelled to challenge said juror.

4. Because the court erred in refusing to allow defendant's counsel to prove by D. R. Morris, a juror put upon the defendant by the state, that he, from having read what was published as the sworn evidence had upon the coroner's inquest, in the Atlanta *Constitution*, a newspaper published in said county, formed and expressed an opinion as to the guilt of the defendant, and that he now entertained that fixed opinion, and refused, upon the request of counsel for the defendant, the court trying the competency of the juror, to ask of the juror any other question touching his competency than those prescribed by the statute.

5. Because the court erred in allowing counsel for the prosecution to ask Renfroe the question, " what was the reason that Col. Alston told Peter to shut the door ?"

6. Because the court erred in admitting the evidence of Renfroe as to the conversation had with Alston immediately before the homicide.

7. Because the court erred in admitting the declarations of deceased to Nelms, as above reported.

8. Because the court erred in refusing to withdraw from the jury the evidence of Woodward.

9. Because the court erred in admitting the conversation between deceased and Murphy, and between deceased and Sams, as testified to by Murphy.

10. Because the court erred in allowing, over the objection of defendant's counsel, the state to read in evidence

what purported to be the evidence of M. W. Sams, a witness who had been sworn for the defendant, taken before the coroner's inquest upon the body of the deceased, R. A. Alston, the objection of defendant being that it was not sufficiently shown that the said M. W. Sams had sworn before the coroner as appeared from this written report of his evidence, and that he could not be impeached by such a written report of his evidence.

11 to 16. Because the court erred in instructing the jury as set forth in divisions marked (1), (2), (3), (4), (5) and (6) of the charge as above reported.

17. Because the verdict was contrary to law.

18. Because the verdict was contrary to the evidence, and decidedly and strongly against the weight of the evidence, and without sufficient evidence to support it.

The motion was overruled, and defendant excepted.

In certifying the bill of exceptions, the court commented upon the grounds in substance as follows:

At the time the motion for continuance was presented and argued, all of the prisoner's counsel of record were present. His, the prisoner's, appearance was that of reasonable health. The trial which ensued was protracted through six or seven days, and the court-room greatly crowded. The prisoner displayed activity when making his statement, and at no time showed, so far as the court saw or knew, manifestations of illness or fatigue. He occasionally, or his counsel for him, asked and obtained leave to retire a few minutes to a jury-room to apply a lotion or attend to his hurt in the mouth. This was the only complaint made. The witness, General J. B. Gordon, came into court at an early day in the trial, and was sworn with other witnesses, but not put on the stand. The court had these facts in mind when exercising discretion, and ruling on the first ground taken in the motion for new trial.

In connection with the challenge to the array, the defendant's counsel produced and read to the court the order of the presiding judge appointing James R. Wylie a jury commissioner.

The jurors Howell and Morris answered all the statu-tory questions so as to make them competent, and were put upon the prisoner. The court permitted various questions to be asked them as to residence, who of kin to, whether one of them had an interest in the *Constitution* newspaper, etc. But on objection made the court ruled that the statutory questions were exhaustive as to any matters covered by them, and declined to ask or permit any other questions seeking further to sift the conscience of the jurors to be asked them. There was no formal attack made on either juror to prove their answers or either of them untrue. This was disclaimed. The offer was to put them respectively on the court as trier, and to ask, or have the court ask, the questions stated in the 3d and 4th grounds.

As to the matter in the 6th ground he refers to the brief of evidence for any needed correction as to the time, place, and circumstances under which this conversation took place.

As to the matter of the 7th ground, this was part of a conversation, the other portion of which had already been given in by defendant.

The 8th ground is to be considered in the light of Woodward's entire testimony.

As to the report of Sams' testimony before the coroner's inquest, the document was not read at the time formally. Parts of it were afterwards used and referred to in argument. Neither side made any request, or invoked any instruction to be given to the jury on the subject, but the court did instruct them as set out in the general charge. The writing itself was never delivered to the jury.

The court, of its own motion, charged in writing, which was filed with the record and the same made a part thereof, and those grounds of the motion which relate to the charge are to be taken and construed in the light of the same.

D. P. HILL & SON; GARTRELL & WRIGHT; CANDLER & THOMSON; D. F. & W. R. HAMMOND; J. A. BILLUPS; R. S. JEFFERIES; W. R. HODGSON, for plaintiff in error.

B. H. HILL, Jr., solicitor-general; HOPKINS & GLENN; PAT-RICK CALHOUN; DUNCAN TWIGGS; SAM. HALL; HULSEY & McAFEE; HOWARD VAN EPPS, for the state.

BLECKLEY, Justice.

1. The motion for a continuance was in writing, and a copy of it is in the record. There were three grounds, two of which related to the absence of witnesses. Only the third was argued and insisted on here, the other two being abandoned. The matter of this third ground is fully set forth in the reporter's statement. There was no suggestion in the motion that at the time of submitting it, or at the time of entering upon the trial, the accused was unable to confer with his counsel, or to undergo the labor and excitement of conducting his defense. If he had wanted a continuance because of his then condition, physical or mental, he could have applied for it on that ground, and if he had done so, the court may have granted it. Certainly there was no abuse of discretion in not granting a continuance upon a ground not presented in the application. Had it been presented, we may be sure that the court would have exercised a sound and just discretion concerning it, and not ruled to trial a man whose condition was not such as to enable him to undergo the ordeal with needful strength, composure and vigilance. Nay, more; we may assume in favor of the humanity of the presiding judge, that if he had been aware, or even believed, that the accused was not in a fit condition to be tried, he would, without any motion whatever, have declined to bring on the trial so long as the unfitness lasted. The sole error complained of in the bill of exceptions is, that the court erred in overruling the motion for a new trial; and when we look to the motion for a new trial, we find in it no point touching the failure to continue, except upon the refusal of the court to grant the continuance on the motion for the same "submitted in writing." So far as appears, there was no ruling whatever made below on the then present fitness of the accused to be put on his

trial. The motion submitted in writing raised no such ques-
tion, but was confined to the absence of certain witnesses,
the existence and causes of excitement and prejudice in the
community, and the alleged previous inability of the accused,
in consequence of his wounds, his confinement in jail,
and his bodily and mental suffering, to make the necessary
corrections and meet and overcome the public excitement
and prejudice and to confer fully with his counsel in rela-
tion to his defense. Not a word did the motion say or sug-
gest as to his then inability or unfitness to do anything. It
said "he has been unable," etc., not adding that he is still
unable, or anything equivalent thereto. In this condition of
the record, we are bound to presume that in so far as it was
the duty of the court to see that the accused was in a fit
state, bodily and mentally, to be tried for his life, that duty
was faithfully performed.

With regard to public excitement and prejudice, we see
nothing to take this case out of the general rule long since
laid down here authoritatively, to the effect that these have
ceased to be cause for a continuance. 24 *Ga.*, 297 ; 48 *Ga.*,
116 ; 60 *Ga.*, 257. It seems quite immaterial that the means
of stirring up the excitement and prejudice were inflamma-
tory newspaper articles. Why should the condition of the
popular mind be treated as more dangerous to the accused
when wrought up against him by the press, than when in-
flamed to an equal degree by any other agency? Is the
press, as such, to be recognized as a power which can re-
tard the trial of persons accused of crime? Newspapers
are free to publish what they please, so that they keep clear
of the law of libel, and if they succeed in impressing the
public mind unduly against an alleged criminal, are the
courts to wait for the storm they have raised to subside,
though the presiding judge should be convinced that there
is no real obstacle to obtaining an impartial jury and hav-
ing a fair trial? Surely it is unsound to make any distinc-
tion, as matter of law, between excitement produced by the
newspapers and that produced by other means. In a county

of forty thousand inhabitants, it is in a high degree improbable that an impartial jury cannot be had, one month and a half after a homicide has been committed, to try the perpetrator. And were a contingency of the kind to occur, the appropriate remedy for it would not be an ordinary continuance until the next term of the court, but a change of venue to another county.

Upon the subject of the prisoner's ability while in jail to confer fully with his counsel and prepare for trial, notwithstanding his injuries and his physical and mental suffering, the court below, on the counter-showing made by the state, was warranted in coming to the conclusion at which the judge arrived. To overrule the motion for a continuance, in so far as it rested on this branch of the showing, was strict practice, and we should have been better satisfied if the judge had been more liberal; but we must try his conduct by the law, and not by our personal feelings, and so doing, must remember that the application for a continuance was addressed to his sound discretion, and that he was in a better position than we are to discern the precise line upon which his discretion ought, in a doubtful case, to move. The question for us is not whether we should have exercised his discretion as he exercised it, but whether he abused it. Being of opinion that he did not, but that he only pursued a strict practice instead of the more liberal practice which we ourselves, if in his place, would have preferred, we, as a reviewing court, must decline to interfere. Code, §3531; 1 *Ga.*, 213; 10 *Ib.*, 86; 14 *Ib.*, 6; 26 *Ib.*, 276; 38 *Ib.*, 491; 46 *Ib.*, 209; 47 *Ib.*, 598.

2. For the reasons indicated in the second note of the syllabus the challenge of the accused to the array was properly overruled.

3. When acting strictly in the capacity of trier, there is no doubt that the presiding judge may decline to have the juror further examined as to his competency, and may look alone to the *aliunde* evidence that is adduced. Code, §4682; 9 *Ga.*, 121; 21 *Ib.*, 220, 227; 32 *Ib.*, 672.

4. The witness, Woodward, was not certain that he heard correctly what the accused said after buying the pistol, but he undertook to testify to the substance of the remark, and he gave his understanding of what it was.   His evidence was not inference, but fact, and his doubt upon the distinctness of his hearing did not render his testimony inadmissible, but only detracted from its force and value.   He drew upon his own mind, not for any conclusion which he had arrived at from the words used, but for the sense and substance of those words as his ear reported them to his mind. Trying his accuracy by other evidence which subsequently came in, there is great probability that he was mistaken, and that the observation really made was different from his version of it; but this was for the jury to deal with in weighing the evidence as a whole, and not for the court in ruling upon its admissibility.

5. The sole objection made to the written evidence of the witness, Sams, as given at the coroner's inquest, and written out from the stenographic notes, was that "it was not sufficiently shown that the said (witness) had sworn before the coroner as appeared from this written report of his evidence, and that he could not be impeached by such written report of his evidence."   It was proved by the stenographic reporter that Sams did swear before the coroner as he was represented in the written report to have sworn, and Sams was duly examined upon the various contradictory passages before they were read to the jury to affect his credit.   His attention was properly called to all the alleged discrepancies, and full opportunity was afforded him to explain.   If the report was correct, as the reporter testified it was, we see not why it could not be used to impeach him.   The argument made here against the admissibility of more of the writing, or its contents, than the particular passages which embraced the discrepant matters, is not within the scope of the objection which we have recited above, and is thus irrelevant.   The objection did not raise the question of how much of the contents of the writing ought to have been submitted to the jury.

6, 7. Before proceeding to discuss the admissibility of the declarations and conversations referred to in the 5th, 6th, 7th and 9th grounds of the motion for a new trial, it is necessary to get a correct standpoint from which to consider them in reference to the question of whether or not they constituted a part of the *res gestæ*? To do this requires a survey of the hostile enterprise which had its inception during the private interview of the parties in the back room of the barber-shop, and of the several steps which each party took to advance or retard the collision which that enterprise contemplated. That there was a hostile enterprise admits of no doubt, and that it was of a criminal nature, involving a concerted and premeditated rencounter with deadly weapons, is equally clear. In his statement made to the jury on the trial, the accused gave this account of it, as a part of his recital of what occurred in the back room of the barber-shop: "Then I asked him, 'Come, Colonel, let us sit down here and settle up this matter between us and close up our business now.' He said no, but said, 'Will you go and arm yourself and fight me?' and I said 'yes, I would fight him any way he wanted to, but let us settle our business first.' He said, 'No, you have promised to fight me,' and I said 'if that was necessary I would fight him in any way he chose, and cut it out or shoot it out.' He said, 'Then go and arm yourself and I will do the same.' . . . . . Colonel Alston said, 'You have agreed to meet me here and fight me; now go;' and as he got to the door, he took out his watch, and with it in his hand he said, 'Meet me here in three minutes.' He went out; and I went out, and into Pause's saloon, thinking, as it was a bar-room, and knowing that they usually kept a pistol about such places, that I would get one there." This bar-room was two doors from the barber-shop, and there, according to the evidence of his own witnesses, he inquired for a pistol of three several persons; one of whom he took aside, and on being asked by him what he wanted with a pistol, he replied that he had to meet a man in two minutes. Being asked who it was,

he answered, "Bob." His friend saying, "You are not going to fight Bob Alston?" his reply was, "Get me a pistol, you are talking to a dead man." Failing to procure any pistol at the bar-room, he went to a gun-store, and there bought one and had it loaded. Having done this, he returned to the bar-room, and was heard to say to Hodgson, an old friend of his, "Now I am ready, let's go." He and Hodgson repaired together to the barber-shop and entered the back room, the same in which the hostile meeting had been agreed upon and in which it was to take place. A conversation at once ensued, which Hodgson details thus: "He said, 'I want you to stay right here.' I asked him what for, and he said he had a difficulty with Alston and he wanted me to stay there and see it. I asked him for some explanations, and he said he had no explanations to make, and he wanted me to stay and I would see; and I said, 'That is very strange, that you would bring a friend of yourself into a place to see a difficulty and never give him any explanations about it?' and he said for me to stay there and I would see—that Alston would be there after awhile." At this stage of the conversation, Sams, another witness for the defense, entered, and he too tried to find out what the trouble was, but apparently without success so far as Hodgson could understand. Hodgson proceeds: "I only heard that there was to be some settlement made, but not what it was. I learned from this conversation that Alston had been in there before, but I could not tell what the difficulty was about. I understood from him that Alston had told him, Cox, to meet him there in two minutes, he might have said ten, and he pulled out his watch and said, 'It's time now.' I saw he was excited, and I said, 'He will come, anyhow; that he was a man of his word, and if he said he would come he would do it.' I tried to get him to wait for him, say, ten minutes, and he noted the time, and told Sams to go and find Alston and tell him that he was there waiting for him according to agreement." Sams and Hodgson withdrew together, the former going out to bear the message to Alston, and the

latter stopping in the front room of the barber-shop. The accused remained in the back room. Presently, Nelms, (another of his witnesses) principal keeper of the penitentiary, entered the front room from the street, and called for an interview, which the accused declined, saying he was "waiting for a friend." After Nelms left, Sams returned, and reported Alston as having said he had reconsidered the matter and would not meet the accused, and that for the latter to attend to his business and he, Alston, would attend to his. On hearing this report, the accused departed to seek for Alston, saying something to the effect that it was all right, but it did not suit him, and that he would go and see him. He went directly to the capitol, looked in at the treasurer's office, was understood to inquire there for Murphy, who was a clerk in that office, went up-stairs to the office of Nelms, inquired there for Murphy or Howard, most probably for Howard, seated himself for a very brief time, then rose and hurriedly withdrew, and descended to the treasurer's office. There he found Alston, who had come in, for the last time, whilst the accused was upstairs. He accosted Alston with this language: "You promised to meet me down the street and settle this thing, why didn't you do it?" Alston answering that he had reconsidered the matter and did not want to have any difficulty, the accused rejoined, "I will brand you." Further conversation ensued, shots were exchanged, each party using the pistol which he had procured for the appointed meeting at the barber-shop. Alston was killed and the accused severely wounded. On the element of time, the evidence indicates that the homicide took place within forty-five or fifty minutes after the agreement to fight was entered into; there is scarcely a doubt that it was within an hour, and it is not very improbable that half an hour would cover the whole of the interval. The building in which the fight took place, and that in which it was to take place by appointment, are both upon Marietta Street, and are only about 150 or 200 yards apart.

Having, in the light of the evidence, traced the accused from the beginning to the ending of the criminal enterprise,

let us follow the deceased in the same way. After leaving the barber-shop he first appeared at the office of Nelms, and endeavored to borrow a pistol. There the conversation occurred to which Nelms testified, and the admission of which in evidence is complained of in the 7th ground of the motion for a new trial. From there (Nelms soon following) he went down stairs into the treasurer's office, where he met with Howard and Murphy, and where Renfroe, the treasurer, on his return from dinner, found him. Here he procured a pistol, and here he received, through Sams, the message which the accused sent from the barber-shop, and made his reply to it. A conversation in which Howard, Murphy and deceased participated resulted in shaping this reply, and in communicating it to Sams for oral repetition to the accused. It is this conversation as testified to by Murphy that is objected to in the 9th ground of the motion for a new trial. From the treasurer's office he went across Marietta street to Berron's on Forsyth street, and there met and conversed with Governor Colquitt. Whilst this conversation was in progress, the accused passed up Marietta street on his way from the barber-shop to the capitol. Separating from Governor Colquitt, the deceased went into Berron's, partook, during a stay of two or three minutes, of a slight lunch, and then returned to the treasurer's office and sat down. A brief conversation between him and Renfroe ensued, and this is the matter of complaint in the 6th ground of the motion for new trial. A step was heard approaching, and Peter McMichael, who was in the room, announced that it was Cox, and deceased ordered McMichael to fasten the door. These remarks, one made by McMichael, the other by deceased, and the question to the witness which drew them out on the stand, form the subject of the 5th ground of the motion for a new trial. The accused entered through the door before McMichael could close it, and when he entered, the deceased rose from his chair, and the final conversation between them began. The shooting followed and hostilities were at an end. The space of time extending from the arrival of deceased at the

office of Nelms and the commission of the homicide, was about twenty-three minutes. His stay at the office of Nelms was only two or three minutes, and from the time he left there until the firing began was about twenty minutes.

The difficulty of formulating a description of the *res gestæ* which will serve for all cases, seems insurmountable. To make the attempt is something like trying to execute a portrait which shall enable the possessor to recognize every member of a very numerous family. Eschewing anything so impracticable, and letting the present case sit for its own individual likeness, its *res gestæ* may be sketched in general language as follows: (1.) Where two persons consent to fight with deadly weapons, and by agreement separate to arm themselves, both intending to return presently and begin the combat, and they do in fact arm themselves and meet, though not at the place appointed, but near it, in the same city and on the same street, and only a little later than the time contemplated, and actually fight with the weapons thus prepared, and one of them is slain by the other, the *res gestæ* of the transaction comprehend all pertinent acts and declarations of the parties (either or both) which take place in the interval between the agreement to fight and the consummation of the homicide such interval being very brief. (2.) Acts are pertinent as a part of the *res gestæ* if they are done pending the hostile enterprise, and if they bear upon it, are performed whilst it is in continuous progress to its catastrophe, and are of a nature to promote or obstruct, advance or retard it, or to evince essential motive or purpose in reference to it; and declarations are pertinent if they are uttered contemporaneously with pertinent acts, and serve to account for, qualify, or explain them, and are apparently natural and spontaneous. See the works on evidence, and the cases they cite. Also the cases cited in Hopkin's Penal Laws, §§527, 528, 530. Code, §§3771, 3773.*

---

*Since this case was decided, useful articles touching declarations as a part of the *res gestæ* have appeared in 21 Alb. Law Journal, 484, 504; 22 *Ib.*, 4; 14 American Law Rev., 817; 15 *Ib.*, 1, 71.

The conversation with Nelms (7th ground of the motion for a new trial) was had contemporaneously with the effort of deceased to borrow a pistol. It opened with his appli-cation for a pistol, and the application was repeated whilst the conversation was in progress. He was on an expedition to arm himself—on a journey, as it were, after a pistol—and he explained the motive and occasion of his being out on such business. Be it remembered, too, that it was the accused, and not the state, that brought up this part of his conduct in evidence. Nelms was a witness for the defense, and on the direct examination he testified to the act and to a part of the declarations which accompanied it. The state but proceeded, on the cross-examination, to draw out the balance of the same conversation. So clearly was the evidence admissible for the latter reason, as will be seen under the next head of this opinion, that its relation to the *res gestœ* is utterly immaterial. Possibly, if it stood on that relation alone, so much of it as consisted of mere narrative or recital ought to be held incompetent, were that portion objected to separately and upon that ground.

In the order of time, the next conversation complained of is that to which Murphy testified (9th ground of the motion for a new trial). Though Murphy was a witness for the state, he was examined late in the trial, and, as will be seen hereafter, this conversation had already been touched upon by one of the prisoner's witnesses, Sams, and by two other witnesses for the state, Renfroe and Howard. It took place during the interview between Sams and the deceased in the treasurer's office, about twenty minutes before the homicide, at which interview the deceased received and answered the message which the accused had sent to him through Sams. Most certainly this exchange of messages was an important event in the occurrences of the day, and the whole of the conversation repeated by Murphy bore directly on the transaction then immediately in hand. A part of it went to the very shaping of the answer which Sams was directed to bear to the accused, and to the inspi-

V 64—26

ration of the pacific spirit by which the answer was per-
vaded.

The matter embraced in the 6th ground of the motion
for a new trial followed immediately upon the return of
the deceased from Berron's and his seating himself in the
treasurer's office, and was succeeded immediately by the
matter set forth in the 5th ground. The evidence com-
plained of in these two grounds, when thrown together,
reads thus: " He (Alston) stated to me, ' This is an awful
thing to have a man hounding you in this way.' I asked
him, ' Did you not meet Cox ?' He said, ' No, he has gone
up stairs hunting me '—and then it was that Peter made
the remark that Cox was coming down stairs. Peter said,.
' Col. Alston, Cox is coming down the steps now;' and
Alston said, ' Go and fasten that door '—and Peter went to
do so, and met Cox there, and Cox passed him and came
into the room." Let it be borne in mind that it was from
this very office that the deceased had sent his answer to the
message of the accused received through Sams; that after
receiving that answer the accused had set out from the
barber-shop to seek him ; that it was to this office that he
first went on reaching the capital ; that the deceased, while.
at Berron's in conversation with Governor Colquitt, had
seen him on his way to the building, and that at the time
the deceased returned from Berron's, he was in fact up-
stairs in the building, and it will be plain that neither of
these parties had passed wholly out of the *res gestæ* of their .
pending difficulty. Both were still armed with the pre-
pared weapons, and both *may* have desired and intended to
use them. The return of deceased to the treasurer's office,.
and there stopping as if to remain, were acts of undoubted
pertinency, and the state of mind in which they were per-
formed—the motive and purpose which attended them—
are of the utmost importance. If he went there to put
himself in the way of the accused and bring on a collision,
and if the accused went with a like object, it was essentially
the meeting which had been pre-concerted in the barber-

shop, and the deceased had either never fully abandoned the hostile scheme, or had abandoned it but temporarily and then returned to it. If, on the other hand, he went to the office perplexed and undecided—doubtful, for the time, what course to pursue, and hoping, without seeming to retire, to have opportunity for further reflection, and perhaps to take counsel of a friend (for he had listened there to counsel a few minutes before), his return was well nigh innocent, and not inconsistent with the change of mind which he had professed, and which he afterwards asserted in answering the first question which the accused so sharply propounded in the fatal interview. His exclamation to the witness, Renfroe, on coming in and sitting down, " This is an awful thing to have a man hounding you in this way," indicates mental torture of a bitterly regretful kind, and if he really felt the agony which his language would suggest, he was deprecating danger rather than desiring to encounter it. His answer to the question, " Did you not meet Cox ?" namely, " No ; he has gone up stairs hunting me," is to be looked at in its relation both to the exclamation which he had just uttered and to the order which he afterwards gave to fasten the door. Instantly, upon being told that Cox was coming, he ordered the door which was between them to be fastened. Taking, collectively, his three utterances they tend strongly to show the state of mind in which he was. They signify that he believed Cox was searching for him with a hostile intent ; and that belief, most probably, induced the order to fasten the door. Under the circumstances, the order was equivalent to an attempt by the deceased himself to fasten the door, and if he had made the attempt, can there be a doubt that the preceding observations would have cast light on his motive for the action ? In the same way, they cast light on his motive for giving the order. The entire conversation is thus within the atmosphere of the *res gestæ*. Considering that the deceased had returned to the treasurer's office knowing that the accused was in the building, and that both were still armed, the return was

an ambiguous act, with rather more of a hostile than of a pacific look. His remaining there was also ambiguous ; it might mean war or it might mean peace. What he said and did in the brief interval between his return and the entry of Cox, tended to explain his presence on what proved to be the scene of the rencounter, and to show whether he was there for action or inaction—whether to meet his adversary or to avoid him. It was competent evidence. The question by which some of it was drawn out was not in the best form, but the court gave the witness to understand that his answer was to be restricted to what he saw and heard, and it was' restricted accordingly. The witness simply detailed the facts, offering no opinion or conclusion of his own.

9. Returning to the conversation proved by Nelms, (7th ground of the motion for. a new trial) the true ground upon which the admissibility of the otherwise doubtful matters of that conversation stands, is that they constituted a part of the same conversation into which the witness entered on his direct examination by the accused, and were drawn out on cross-examination. Upon the direct examination the witness testified :   " It was probaby three o'clock in the day that Col. Alston came in and asked me for a pistol, and I said mine was at home shot out, and I asked him what he wanted with it, and he said he had liked to have had a difficulty, and I said, come in and tell me about it, and he came in and sat down. I asked him who it was with, and he said it was with Ed. Cox, and told me about it. "   In the cross-examination, the witness was directed to state all the conversation, and he proceeded through it from where he had left off. Not to look further for authority, this was clearly proper under several decisions of this court. 10 Ga., 145 (text of opinion ; 12 *Ib.* 505 ; 22 *Ib.* 40 ; 26 *Ib.* 172.

Furthermore, by turning back to the reporter's statement, it will be seen that a very similar conversation, in so far as it embraced recitals or narrative by the deceased, was put in evidence by the accused in the testimony of Governor Colquitt. The state also afterwards, and without any objec-

Cox *vs.* The State.

tion, so far as appears, proved a conversation between the deceased and Howard, detailed in evidence by Howard as follows: " He said that Cox had taken him into a room and told him if he did not rescind the trade he would kill him. I said, he certainly did not say that. He said he did, and he let me out and told me to heel myself and come back in ten minutes. He said he thought he ought to take a double-barreled shot gun, load it with slugs and go and kill him." Were the evidence of Nelms, so far as objected to, eliminated as illegal (but as above said, it was entirely legal), a new trial would not necessarily follow, much the same sort of matter being before the jury through these other two witnesses.

Adverting again to the 9th ground of the motion for a new trial (Murphy's evidence), Howard was examined before Murphy, and testified without objection thus : " I took Mr. Murphy aside and told him let us stop this, and we persuaded Alston to stay in that part of town, and he did so, though he did not like to be bullied that way. Then directly he said, 'Here is a man who has come with a message from Cox for me to come down there and settle it like a man;' and I said to the man, ' did he send that message ?' and he said, 'yes, and I am sorry to bring it.' That was Mr. Sams, and I said to him, 'you go and tell Cox to stop this and wait; I will be down there directly and give him some advice, and he will thank me for it the balance of his life.' And Alston said, ' Go and tell him I have reconsidered the matter and will not come—that I don't want to kill him and don't want him to kill me.'" Before Howard testified, the accused had proved by Sams a part of what was said at this interview ; and, first of all, Renfroe had gone into it, the accused it seems objecting, but not carrying forward the objection into the motion for a new trial. If Murphy's evidence was doubtful or even inadmissible as a part of the *res gestæ* (but it was neither), it would not, considering what was already before the jury when it came in, and remained before them, be sufficiently material to require a new trial. In substance

it was but little more than Howard had testified without objection; and at no time was there any motion to withdraw this testimony of Howard. However, the correctness of classifying Murphy's evidence with the *res gestæ*, as we have done above, is indubitable.

10. 11. 12. 13. 14. As the entire charge of the court is set out in the report, it can be studied by every reader for himself, and to remark upon it further than has been done in the head-notes would be superfluous. It is a very able and admirable charge.

On both sides the case was argued before us with unusual thoroughness and remarkable ability. The result of the argument and of a careful examination of the record, has been to satisfy a majority of this court that there was no error in overruling the motion for a new trial.

Judgment affirmed.


JACKSON, Justice, concurring.

The exhaustive opinion of my able colleague, who announced the judgment of the majority of the court, leaves me nothing to say. Complying with the law, however, which requires me to state my reasons for concurring in the judgment, I wish to say that those reasons are to be found at length in the opinion of my colleague, and to add that on the point in which the venerable Chief Justice differs from us my views very briefly are these:

1. While as a circuit judge presiding in this case, I might have ruled differently on the motion for a continuance, yet I cannot say that the court abused his discretion in the ruling he made. He had the defendant before him and saw his condition; he could judge of all the surroundings; he heard the evidence *pro* and *con*; in the light of all the facts, he made his ruling, and I cannot say that he erred.

2. The meaning of *res gesta* is the thing carried on. To show the thing carried on, its beginning is as essential as its ending. An enterprise is carried on by acts and words. In-

deed, whenever the internal operations of the mind are involved, words become verbal acts, and are admissible upon the same ground as acts. This thing, this enterprise was begun in the barber-shop; it was carried on all through the interval before the final meeting; it was carried on in that final meeting; it was carried on in the arming of each and what each then said; it was carried on in each shot that was fired; it was carried on until Alston lay weltering in his blood. Every act, every word, from the beginning to the end, which carried on the thing, the enterprise, formed a part of the *res gesta*. The intention of both parties was a leading question in the case. The state of their minds was involved. That state appeared by acts and by words, which took place while the difficulty was in progress; and the verbal acts of the parties were admissible like their other acts. But even if this view should not be conclusive—if as well the plain meaning of *res gesta*—the transaction—the thing as carried on from inception to conclusion—from the agreement to fight to its close in the homicide—as the well understood rules of law governing the introduction of testimony in respect to *res gesta*, be not applicable to all this transaction as developed by this evidence—then it will be seen that the defense either opened the door and entered on the investigation which admitted the other side also to go in, or by their own examination of their own witnesses proved substantially the same occurrences which were but amplified or more fully explained by the state.

Not only as *res gestæ*, but on the principles last mentioned, all the testimony was, in my judgment, admissible.

The entire charge is fair and legal—the evidence sustains the verdict—and my sense of duty demands that I affirm it. Most gladly would I restore the living to freedom and family—the dead to life and family, if I could; but these I cannot do.

It remains that I administer the law impartially as I understand it, and that leads me clearly to the conclusion that the defendant has had a fair trial—that he has been legally convicted, and that the judgment should stand.

WARNER, Chief Justice, dissenting.

Whilst public excitement alone would not have been suf-
ficient to authorize the continuance of the case, still, when
that public excitement is aggravated by inflammatory news-
paper publications calculated to prejudice the public mind
against the defendant, as set forth in the record, coupled
with the fact of the defendant's physical condition result-
ing from wounds received in the then recent difficulty, as
established by his attending physician, and not denied, to-
wit: having received a pistol-shot wound in his mouth,.
knocking out three upper jaw teeth and four lower jaw
teeth, and indenting one of his teeth in his tongue, and had
another pistol shot wound in his left hand and wrist;.
his tongue so lacerated and swollen that the saliva was
constantly oozing from his mouth, and in the opinion of
the doctor he was unable to confer with his counsel fully
and prepare his case for trial.  By the constitution of the
state the defendant was entitled to a trial by an *impartial*
jury, and was entitled to defend his own case in the court
in person, by attorney, or both.  From the evidence in the
record it is manifestly apparent that the defendant was not
in a condition to exercise his constitutional right to defend
his own case, and by forcing him to trial in that condition
deprived him of that right, for it was his undoubted consti-
tutional right to defend his own case in person, by attorney,.
or both.  The spirit of the constitution, as well as the ends
of justice, required a continuance of the case.

In my judgment the court erred in admitting the declara-
tions of Alston, the deceased, to Renfroe and Nelms, as
contained in the 6th and 7th grounds of the motion for a
new trial, in so far as the same related to the acts and say-
ings of the defendant, in his absence, said grounds being as
follows :

6th. Because the court erred in allowing J. W. Renfroe,.
a witness for the prosecution, in answer to questions by the
state, and over objection of defendant's counsel, to testify
to a conversation had with the deceased from five to ten

minutes before the difficulty, ending in the death of Alston, commenced, and not in the hearing of the defendant, as follows: 'He (Alston) stated to me, ' This is an awful thing to have a man hounding you in this way.' 'I asked him did you not meet Cox?' " He said 'No, he is gone up-stairs hunting me.' "

7th. Because the court erred in admitting in evidence, over the objection of defendant's counsel, a conversation between J. W. Nelms and the deceased, which occurred twenty minutes before the killing, in a different part of the building and in the absence of Cox, as follows: "Alston told me he had like to have had a difficulty and wanted a pistol. I told him to come and sit down and tell me about it. I asked him who he was about to have a difficulty with; he said with Cox. Said he 'Nelms, he carried me in to take a drink with him and I would not drink with him, and took this cigar (had a cigar in his hand) and then he took me into a back room of a barber-shop and shut the door and said, ' Bob, I want to see that power of attorney you have to sell Gordon's interest.' And I said I would not show it under compulsion, and Cox said, 'I am going to see it before you leave this room.' And that he (Alston) said, 'aint you a nice great big rascal here with your knife when I have not got a piece of steel on me, to try and force me to terms.' And he said, ' go and arm yourself and I will wait for you, and, he said he is waiting for me now; and he asked me again for a pistol, and I said my pistol was at home."

The illegal part of Renfroe's testimony was in proving by Alston's mere declaration " that the defendant had gone up-stairs hunting him." The defendant had a perfect right to go up-stairs in the capitol building, and there is not a particle of evidence in the record, either by word or act on the part of the defendant himself, going to show that he had gone up-stairs hunting Alston, and surely he ought to be judged by, and held responsible for, his own acts and declarations, and not by the acts and declarations of other people made behind his back, the more especially as in this

case Alston was not in the capitol-building when the defendant entered it, but was standing at Berron's in full view of the defendant as he passed along the street, going into the capitol-building where it was said he was hunting him. Is the law so unreasonable as to make one man responsible for what another man may say he is doing, or going to do, behind his back, when he has no opportunity to deny or contradict the statement? Such has not heretofore been my understanding of it. The hunting of the deceased by the defendant was a most damaging fact against him on his trial, and how was that damaging fact proved? It was proved by the mere declaration of the deceased to Renfroe behind his back when he had no opportunity to deny or contradict it; and the same remarks are applicable to the declarations made by the deceased to Nelms in regard to the acts and sayings of the defendant at the barber-shop. But it is said this evidence was admissible as *res gestæ*. What is *res gestæ* as defined by the law of this state? " Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of the *res gestæ*." Code, §3773. The declarations of Alston when he applied to Nelms for his pistol would be admissible in his favor in explanation of that act, and perhaps his declarations to Renfroe might be admissible in his favor in explanation of his own acts and conduct at the time as part of the *res gestæ*, but how Cox, the defendant, can be made responsible by Alston's declarations made to Renfroe and Nelms behind his back, and be used in evidence to injuriously affect the defendant as part of the *res gestæ* accompanying any *act of his*, or connected therewith when the declarations were made, is more than I can understand. In my judgment it was a total misapplication of the doctrine of *res gestæ* to admit the evidence complained of in the 6th and 7th grounds of the motion as against the defendant.

The court charged the jury amongst other things: " It would be unlawful for two persons to deliberately conspire

or agree together to procure deadly weapons and meet again to fight therewith, and if in the heat of blood they do so agree, it would be the duty of both of them and each of them to heed the voice of reason and humanity if there was an interval sufficient for that voice to be heard, and to re-consider the matter and decline such hostile meeting, and if one of them does so reconsider and decline such meeting, and the same be communicated to the other, it would be the duty of that other to acquiesce therein ; and if that other refuse so to acquiesce and persists in an original hostile pur-pose, and if, pursuant thereto, he, armed with a deadly weapon, seek his adversary with a deliberate intention of bringing on such difficulty and of using such weapon therein, notwithstanding the other's refusal, and if he does so bring on the contest, and in such difficulty he slay his op-ponent with that weapon, it would be murder in such slayer."

This charge of the court was error in view of the ev-idence in the record, inasmuch as it did not present the defendant's theory of his defense for the consideration of the jury. The evidence shows that the agreement to meet and fight at the barber-shop had been abandoned. The de-ceased had however procured one of the best self-cocking pistols in the city, and while standing at Berrons' talking with Governor Colquitt, saw the defendant go into the cap-itol-building, and said that he did not know but that it was his duty to his family to take a double-barreled shot-gun and shoot him when he saw him; said he had a pistol then. Shortly thereafter the deceased went into the capitol-building where he had just seen Cox, the defendant, go, and went into the treasurer's office where the difficulty occurred— Alston firing the first shot, having Nelms between him and defendant at the time. Although the deceased had sent the defendant word that he would not meet and fight him at the barber-shop, but whether he was willing to meet and fight the defendant in the treasurer's office, and was seek-ing him for that purpose where his friend Murphy, who had

furnished him with the pistol, and his other friends were, depended upon the acts and conduct of the deceased as disclosed by the evidence. The defendant's theory from this evidence was, that although the deceased had declined to meet and fight the defendant at the barber-shop, still he was willing to meet and fight him in the treasurer' office where his friends were, and was seeking Cox with a hostile intent for that purpose; that being a lawyer as the evidence shows, his declaration to Renfroe that " this was an awful thing to have a man hounding you in this way; he is gone up stairs hunting me," was made so as to justify himself in case he should meet Cox and should kill him in the rencounter; that he was apparently seeking Cox by following him into the capitol-building where he had just seen him go. Whether this theory was true or not, the defendant was entitled to have it submitted to the jury for their consideration under the evidence in the case. The deceased evidently was not endeavoring to avoid Cox when he followed him into the same building he had just before seen him enter, instead of getting his dinner as Governor Colquitt advised him to do. It is quite certain that if Alston had not followed Cox into the capitol-building, into which had just before seen him enter, armed with his self-cocking pistol, the fatal difficulty in the treasurer's office would not have occurred. What was Alston's intention in following Cox into the capitol-building just after he had seen him enter it, might have been inferred by the jury from Governor Colquitt's evidence, under a proper charge of the court in relation to the defendant's theory of the case—that evidence is, that Alston said a very short time before the parties met in the treasurer's office, that he did not know but it was his duty to his family to take a double-barreled shot-gun and shoot him (Cox) when he saw him. This declaration of the deceased clearly shows what was the state of his feelings toward the defendant at the time and in a few minutes thereafter. When he did next see him it was in the treasurer's office in the capitol-building, and in the rencounter which took place there between the

parties, the deceased fired the first shot. This is in substance the evidence in support of the theory of the defense—his side of the case—which he was entitled to have had submitted to the jury in the charge of the court. The defendant may or may not be guilty, but whether he is or not, he was entitled to a fair, impartial trial as provided by the constitution and laws of his country; and not believing, according to my best judment, that he has had such a trial, there is no power on earth that can extort from me as a judicial officer a judgment affirming his conviction.