JAMES THOMPSON, plaintiff in error, vs. THE STATE OR GEORGIA, defendant in error.

[1.] When a prisoner charged with the crime of murder, applies for a continuance, he must make a strict and special showing, and it must appear that the absent person whose testimony he professes to want, is in fact a witness, to some matter necessary to his defence, and if he knows of this, from information only, he ought to submit the affidavit of his informant.

[2.] Public excitement not sufficient ground to entitle a prisoner accused of felony to a continuance, since the passage of the Act of 1856, in relation to the empannelling of jurors.

[3.] A question may be asked a prisoner, who has made a showing in writing for a continuance, which is intended merely to enable the Court to procure the attendance of a person as a witness, on account of whose absence he was proposing to continue the cause.

[4.] The formation and expression of an opinion, *from report*, as to the guilt or innocence of a prisoner, does not disqualify a person from serving on his trial, as a juror.

[5.] Declarations of a person made *in extremis*, and at the point of death, when he had no hope of recovery, admissible as dying declarations.

[6] The terms in the Statute "serious personal injury on the person killing" means a bodily injury, and not a personal affront—or a personal wrong.

Murder, from Muscogee county.    Tried before Judge WORRILL, at November Term, 1857.

James Thompson was indicted for the murder of John Calhoun.

The case being called, the Solicitor General announced ready for the State.    The prisoner's counsel moved for a continuance, on the grounds:

1st. That the crime of which he was charged having been recently committed (but a few days before,) he had not been able to prepare his defence.

2d. That a witness whose testimony was material to his defence was absent.

3d. That the public mind was so excited against prisoner that he could not safely go to trial at this time.

The motion for a continuance was overruled by the Court, and prisoner's counsel excepted.

In selecting a jury, Frank Bracken, being called, was asked by the Solicitor General " whether from having seen the crime committed, or from having heard any part of the evidence under oath, he had, formed or expressed any opinion relative to the guilt or innocence of the prisoner at the bar ?" Bracken replied, " I have :" The Solicitor General then by permission of the Court, counsel for the prisoner objecting, asked Bracken whether he had seen the crime committed, he replied, " no." Solicitor General then asked him if he had heard any part of the evidence under oath, he replied, " no," but that he had formed his opinion from report. The Solicitor General then propounded the other questions required by the statute. Counsel for prisoner proved by the Solicitor General, that he had heard Bracken declare that he had formed or expressed an opinion as to the guilt or innocence of the accused. The Court pronounced the juror competent, and prisoner's counsel excepted.

## Evidence for the State.

George Morman, sworn, says : Deceased and witness went to Jane Wardsworth's together; when they got there, found four or five men there; these men remained about half an hour and then left. After they left, deceased and Barbara Playmile went off into a room together; deceased asked witness to wait for him and not leave him. Witness remained in the room about three quarters of an hour; got tired waiting and thought he would go home; went to the room where deceased was, and knocked; deceased asked if it was witness; witness replied that it was, and said to deceased come let's go; remained there a few moments, when prisoner and Guilford knocked at the door; they came in the house; prisoner with his knife open in his hand; they passed witness, and prisoner pushed open the door of the room where deceased was in; prisoner and Guilford walked in, and witness walked in after them; prisoner gathered the girl Barbara round the waist and said, this is too sweet for niggers—prisoner re-

mained in the room a few minutes, and pulled out a bill and said he would bet ten dollars that he could whip any God damn son of a bitch in the house. Calhoun then said he would bet twenty-five dollars that nobody in the house could whip him, and stamped on the floor; prisoner threw his hand on the bureau with the bill in it, and said he would or could whip deceased, and at once gathered him by the collar and shook him a little; the knife was still in prisoner's hand, opened. Calhoun said to prisoner, "if you attempt to stick me with that knife, I'll blow a hole through you," and then put his hand behind him. Prisoner then shook Calhoun by the collar and said God dam you, I am not afraid of you, and flourished his knife around. Witness took hold of prisoner by the wrist and said, Jim behave yourself; prisoner then said to witness, if you dont turn me loose I'll cut you. Prisoner still had Calhoun by the collar and flourishing his knife about. Prisoner struck Calhoun in the face, either with the flat side of the knife or with his hand, and Calhoun then struck prisoner. After Calhoun struck prisoner, they closed together, swept out of the room which was the last witness saw of them together. Guilford went out of the door with them, and as they went out, he either struck or kicked at one of them. Witness thinks Guilford kicked at Calhoun; never heard anything after they went out. After prisoner came back into the house, he asked witness if he saw him cut Calhoun Witness replied "no,"—so thinks; prisoner said he cut him pretty damn badly, and showed the knife to witness and Jane Wardsworth. Witness then left the house, went off to hunt deceased; did not see deceased again till the Coroner's inquest. This took plack on the 4th December, 1857, at Jane Wardworth's in the county of Muscogee. Witness don't know that prisoner had any thing particularly to do with Barbara Playmile; he went to see her occasionally, and was in love with her. Believes the knife here shown to witness, to be the knife used as stated; only saw the blade at the time; had seen the knife before.

*Matilda Wilson*, for the State, swears: That she saw one lick through the bottom of the window. Calhoun came there (to Jane Wardsworth,) with George Morman. He was in the room with this girl at the time Thompson came in. Morman was in the hall; prisoner knocked at the door and Morman let him in; prisoner went in and commenced talking to Barbara Playmile; prisoner turned round and said, " hell, Calhoun, you here;" asked Calhoun what was the news; Calhoun said " none at all I believe." Deceased then asked, " what's the news with you, Mr. Thompson." Thompson replied, " none—I'm drunk." Jim Guilford, prisoner and Calhoun, went out of the room together. Witness did not see any lick nor any person attempt to strike— saw one lick after they had gone out of the door. As Calhoun started to run towards the gate, the lick was struck by prisoner on Calhoun with his fist. After they had gone out, witness heard Calhoun say " do pray if I have got any friends, take the knife away from him." Witness never heard anything more like blows or fighting.. They were out of the door about fifteen or twenty minutes; prisoner came in the house into my room and said " Matilda, I have cut him and will cut him again," and showed witness a knife with blood on it. [A knife shown to witness.] This is the knife which did the cutting. This took place between eleven and twelve o'clock last Friday in this county. Deceased did not come back into the house. Prisoner said that deceased " broke and run as soon as he quit him."

*John Duncan* for the State, swears: He saw Calhoun the night he was cut; deceased asked witness to go after the doctor; he appeared to be feeble and short of breath, leaned on witness; witness saw that he was cut; saw three wounds on him; one on his left side, one on his breast and another wound. This was on Friday night last.

*Dr. Carriger*, for the State, swears: That he was called to see deceased last Friday night; deceased was very faint from the loss of blood; breathed with difficulty; one wound in

the side, one in the small of the back, several on the head, and elsewhere; his opinion was that deceased would live but a little while; never told him that night that he would die. Deceased told witness he wished to bid him farewell, that he was dying; witness tried to cheer him up; the severest wounds were one in the stomach and one in the left side, at the junction of second rib with back bone. Witness thinks the wounds mentioned in all probability would result in death; attended him till his death, which took place at eleven o'clock on Sunday; he died of the wounds. Witness found deceased at Mr. McMichael's, near the gas works.

*Wm. McMichael,* for the State, swears: That on last Friday night while in bed, somebody knocked at the door; thought he knew the voice at the door—and deceased came to house of witness—the doctor said that there was no chance for him; that he was obliged to die; there was no chance for him; deceased was very faint; had some four or five wounds on him; was very bloody when he came to house of witness, he staggered and fell against the bed, and would have fallen over had he not supported him. Witness said to him, how could a man hold you and cut you so? Deceased said that Guilford held him and prisoner cut him; he begged witness to get a doctor for him, and do all he could for him, that he was bound to die. When deceased came to witness' house it was about 11 o'clock on Friday night last; said he had been cut at the house of Jane Wardsworth in this city—said that Guilford and prisoner pulled him out of the door.

*Cross-Examined*—Deceased said he was in the yard and not in the house. At the time he made this declaration to witness, deceased did not use any harsh words about prisoner, nor say anything against him; did not ask witness to send for a preacher or express any desire to live on, previous to making the declaration. The knife identified by witness, was a spring back dirk knife, the blade about four inches long.

Counsel for prisoner objected to the statements or declarations of deceased, and moved that they be excluded.

The Court overruled the objection and admitted them as dying declarations, and counsel excepted.

The State closed.

The prisoner introduced no testimony.

The Court amongst other things, charged the jury "that they must believe from the testimony that there was some assault by the deceased on the prisoner, or an attempt by him to commit serious *bodily* injury on the prisoner, to constitute the crime voluntary manslaughter."

To which charge prisoner excepted.

The jury found the prisoner guilty; whereupon his counsel moved for a new trial on the grounds of error in all the rulings and charges above excepted to, and because the verdict was contrary to law and the evidence, which motion for new trial was overruled by the Court and counsel for prisoner excepted.

JNO. A. JONES and J. J. SLADE, for plaintiff in error

Sol. Gen'l. OLIVER, for the State.

*By the Court.*—McDONALD, J. delivering the opinion.

The prisoner on his conviction, moved the Court below for a new trial, and in the motion embraced all the decisions and rulings of the Court prior to and during the progress of the trial. The Court overruled the motion and the prisoner excepted.

[1.] The first ground of the motion is the alleged error of the Court in refusing the continuance of the cause. In crimes of the grade of that charged against the prisoner, motions for continuance must be strict and special. It is

Thompson vs. The State.

not sufficient for him to say that he has not been able to take steps towards preparation for his defence. It should appear in what respect he has not been able to prepare, as that he has witnesses; what he expects to prove by them; the ground of his expectation; who they are, and that he has not, on application, had an opportunity afforded him to procure their attendance. The defendant deposes that until the bill was returned into Court he was unadvised as to the nature of the offence which would be charged against him. He knew he would be charged with homicide, and it was his duty to prepare for the grade of homicide which would constitute the highest offence against the laws. It does not appear that he had a witness who could prove any material fact. He gives the name of George Spivey, but it does not appear, with sufficient distinctness, that Spivey knows a single fact. The prisoner stated that he was informed and believed that Spivey would prove certain facts, set forth in the affidavit. He does not even give the name of his informant, when he should have submitted his affidavit, with proof by himself or others, that Spivey was present at the time the act charged upon the prisoner was committed.

[2.] That the public mind was excited against the prisoner by the act, is no cause of itself for putting off the trial. It ought ever to be remembered, in discussing a point like this, that, such is the benignity of the law, the jury are always instructed by the Court, that if a reasonable doubt rests upon their mind of the guilt of the prisoner, they should acquit him; and further, that the Court will not, in cases of conviction of a prisoner charged with a capital offence, allow a verdict to stand which could have been rendered by a prejudiced jury only. Prior to the Act of 1856, in relation to the qualification of jurors to serve on the trial of persons charged with felonies, this Court had inclined to listen favorably to applications of this sort. Since that time, it is impossible that a party on his trial for such an offence, if he choose to avail himself of all his legal rights, can have an

unfair trial, unless it be by the perjury of persons put upon him as jurors, or the palpable misconduct of the officers of the law. In this last respect, he is as much liable to imposition and wrong in times free from excitement, as when there is an inflamed state of the public mind. The prisoner is not bound to have as a juror, a person who from having seen the crime committed has formed or expressed any opinion as to his guilt or innocence; or who has any prejudice or bias resting upon his mind against him; or who is not perfectly impartial between the State and himself. We think that the laws fully protect and guard the rights of persons accused of the higher grade of crimes, by wisely providing for them an impartial trial; giving them the benefit of any reasonable doubt of guilt left on the mind of the jury by the evidence; and, ultimately, by entitling them to a new trial if the verdict be against the evidence, the law, or justice of their case.

[3.] The record in this case shows that the question put to the prisoner by the Solicitor General, as to the source of his information in regard to Spivey, was not intended to counteract the effect of the written showing made by the prisoner for the continuance of his cause, but to enable the Court to have the witness produced at the trial for his benefit, if possible; and that the decision of the Court in regard to the continuance was not placed upon evidence elicited by the question of the Solicitor.

[4.] The formation and expression of an opinion relative to the guilt or innocence of a prisoner from report, does not disqualify a person from serving as a juror on his trial.

[5.] The evidence shows that the declarations of deceased given in evidence against the prisoner were made when he was in extremity, in the apprehension of death, and when all hope of recovery was gone, and the deceased at the point of death. These declarations were evidence, and properly admitted by the Court.

[6.] There is no error in the charge of the Court to the

jury that they must believe from the testimony that there was some assault by the deceased on the prisoner, or an attempt by the deceased to commit a serious bodily injury on him, the prisoner, to constitute the crime of voluntary manslaughter. If a charge be not in the very words of the statute, if it be not contrary thereto, it is legal. The terms of the act "to commit a serious personal injury on the person killing," means a bodily injury, and not a personal affront, or a personal wrong. It must be an injury that may deprive of life, and which must be prevented by a resistance of the like sort.

Without going through the evidence in this case, it is sufficient to say that the finding of the jury is abundantly supported by the testimony, and that the conduct and act of the prisoner in taking the life of deceased, show an abandoned and malignant heart, which fix upon him the crime and guilt of murder.

Judgment affirmed.