[No. 546.    August 25, 1893.]

## JOHN A. ROPER, APPELLANT, v. TERRITORY OF NEW MEXICO, APPELLEE.

CRIMINAL LAW—MURDER—FAIR AND IMPARTIAL TRIAL—SEPARATION OF JURY—NEW TRIAL.—On a prosecution for murder in the first degree, the defendant was not entitled to a new trial, on the ground of the separation of the jury, where it was affirmatively shown that such separation was necessary, and without prejudice to defendant. But where it appeared, in such prosecution, from affidavits filed therein, that defendant was entitled to a continuance or change of venue, on account of existing local prejudice and excitement, and his counsel below through fear of mob violence to his client, refrained from asking for either, the defendant did not have such trial as is guarantied to the accused by article 6 of the amendments to the constitution of the United States, providing that, "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury * * * and to have the assistance of counsel for his defense," and was entitled to a new trial on that ground; and the court below abused its discretion in refusing to grant it.

ID.—MURDER—PRIOR MISCONDUCT OF ACCUSED—EVIDENCE.—Where, on such prosecution, there was no evidence that the deceased was robbed at the time of the murder, it was error to admit evidence that defendant attempted to "hold up" a person other than deceased about four hours before the murder. Gifford v. People, 87 Ill. 210; 1 Whart. Ev., sec. 29.

APPEAL, from a judgment convicting defendant of murder in the first degree, and sentencing him to be hung, from the Third Judicial District Court, Dona Ana County. Judgment reversed; FREEMAN, J., dissenting.

The facts are stated in the opinion of the court.

WARREN, FERGUSSON & BRUNER and R. L. YOUNG for appellant.

EDWARD L. BARTLETT, solicitor general, for the territory.

It was in the discretion of the court to allow the jury to separate, and such separation was not prejudicial to defendant, and, unless some prejudice is shown, there is no ground for a new trial. The harmlessness of such separation appears from the affidavits of the bailiffs. Territory v. Nichols, 3 N. M. (Gil.) 107; Territory v. Chenowith, Id. 320; 3 Rice, Ev., par. 184, and cases cited; Drew v. State, 124 Ind. 9; Stewart v. State, 17 S. W. Rep. (Tex.) 908; Dobson v. State, 17 S. W. Rep. (Ark.) 3; Territory v. King, 6 Dakota, 131; S. C., 50 N. W. Rep. 623; People v. Wheatley, 88 Cal. 114; S. C., 26 Pac. Rep. 267; Custis v. Commonwealth, 87 Va. 589; S. C., 13 S. E. Rep. 73; State v. Orrick, 106 Mo. 11; S. C., 17 S. W. Rep. 176; Commonwealth v. McCaul, 3 N. E. Rep. (Mass.) 76; State v. Flack, 48 Kan. 14; S. C., 29 Pac. Rep. 971.

Change of venue is purely a statutory right, and can be obtained only in the way prescribed by the statute. Laws, 1889, ch. 77, p. 183.

While it may be conceded that under this statute defendant is entitled, under certain circumstances and at certain times, to a change of venue as a matter of right, yet, when he has waived that right, by failure to assert it, any subsequent relief which he seeks rests

within the sound discretion of the court. Territory v. Kinney, 3 N. M. (Gil.) 146; Adams v. State, 10 So. Rep. (Fla.) 106; Martin v. State, 21 Tex. App. 1; S. C., 17 S. W. Rep. 430.

On a motion for new trial on the ground of newly discovered evidence, there must be some showing that proper diligence has been used. Territory v. Faulkner, 6 N. M. 489.

Manacling a prisoner when on trial, is a matter resting in the discretion of the trial court. Territory v. Kelley, 2 N. M. 295.

It is not error to refuse instructions to the jury differing from those already given only in phraseology. Territory v. Baker, 4 N. M. (Gil.) 273; Anderson v. Territory, Id. 222; People v. Hubbard, 52 N. W. Rep. (Mich.) 729; State v. Robinson, 35 S. C. 430; 14 S. E. Rep. 766; Muely v. State, 18 S. W. Rep. (Tex. App.) 411.

Objections to evidence can not be made for the first time in the appellate court. Comp. Laws, 1884, secs. 2197, 2188; Territory v. O'Donnell, 4 N. M. (Gil.) 208; Territory v. Hicks, 6 Id. 604; Wheelock v. MaGee, 1 N. M. 573; People v. Graney, 52 N. W. Rep. (Mich.) 66; Johnston v. State, 10 So. Rep. (Fla.) 686; 3 Rice, Ev. 258.

The three "hold ups" form separate links of one transaction, all leading to the same crime, and evidence in each was admissible as showing the motive and intent of defendant to raise money in some way or other. The defendant neither at the trial nor does he now complain of the admission of the evidence as to the "hold up" of the negro boy; and if that evidence was competent, this must be, for the offenses were identical and almost simultaneous. 3 Rice, Ev., p. 208, et seq.; People v. Harris, 33 N. E. Rep. 65; Stout v. People, 4 Park. Crim. Rep. 71.

Independent crimes may be proven where the acts are shown to have been done as parts of the same plan or scheme. 3 Rice, Ev. 211; Jordan v. Osgood, 109 Mass. 457; People v. Wood, 3 Park. Crim. Rep. 681; State v. Raymond, 53 N. J. Law, 260; Commonwealth v. McCarthy, 119 Mass. 354.

Evidence of defendant's acts and movements during the time prior to the murder and leading up to it was competent. 3 Rice, Ev. 73; People v. Harris, 33 N. E. Rep. 65.

FALL, J.—This cause comes here by appeal from Dona Ana county. The facts, as disclosed by the record, are as follows: The district court for that county was held in Las Cruces, commencing on the sixth day of March, 1893. On the ninth day of March, Samuel Steel, a young man of seventeen years, a relative of the presiding judge, JOHN R. McFIE, was found unconscious at a point on a road or street a short distance from the town, with a bullet wound entering the eye, penetrating the head, and coming out toward the back part thereof, at a point above the place of entry. The defendant, John A. Roper, was arrested on the next morning, the tenth, promptly indicted for the murder, arraigned, and placed upon trial upon the fifteenth instant. The evidence was entirely circumstantial. Fifteen witnesses were examined for the territory. Samuel Steel, father of deceased, testified as to being called by Rodriguez, and finding his son's body, at 7 or half past 7 P. M., on the evening of the ninth, and that deceased died within about two hours. Dr. B. E. Lane examined deceased, and found a wound in the eye, ranging down, and then up, and out at back of head; but only made an examination with fingers. Wound small. Llewellyn Gans, druggist, corroborated Dr. Lane's testimony, and thought wound made by pistol of about thirty-eight caliber. Dr. Petin testified that deceased delivered milk to him at his

home, beyond where deceased was found, about sun-
down, on evening of ninth. Saw no one else pass.
Pedro Gonzales testified that he knew defendant, saw
him in Las Cruces on afternoon of ninth in Lapoint's
saloon, gambling, and that defendant had a pistol,
identified as a thirty-eight caliber. Jacobo Chavez
identified pistol secured by officers in arresting defend-
ant as the same which defendant had in Lapoint's
saloon. Albert Ellis, that defendant was riding a dark
horse, and left town about 6 o'clock or thereabouts;
also identified pistol. Adolph Saens, had known
defendant. Saw him in Las Cruces, and went with
him from Lapoint's saloon to Ellis' corral. On the
street met a negro, and defendant asked negro for
money, and made him turn his pockets out. Witness
told defendant that negro had no money, to "let him
alone," and defendant did so.

Witness also identified pistol thirty-eight caliber.
Jesus Maria Rivera was coming from Dr. Petin's house
about 6 or half past 6 in the evening. Met deceased
going to Dr. Petin's, going toward town, at a distance
(as shown by witness Baker) of four hundred and ten
paces from where deceased was found dying. Met a
man on a dark horse, who, presenting a pistol,
demanded money of witness, who offered a pocket
knife,—all he had. Assailant rode off with a yell.
Identified defendant as party who held him up. Had
never seen defendant before the attempted robbery.
It was after sundown, but not dark. After leaving
defendant, witness walked (as shown by witness
Baker) two hundred and ten steps, and heard a shot.
"Came on to town." Defendant rode off from wit-
ness in a walk. Philipine Durier saw deceased pass
his house toward that of Dr. Petin, about half past 6.
Afterward heard a shot. Heard nor saw anyone else
except witness Baker. Ramona Rodriguez de Valencia
heard a shot about half past 6 or 7, and heard a wagon

running. Deceased was brought into her house. Domingo Rodriguez, husband of last witness, returned from Mesilla, and his wife told him she had heard a shot, and a wagon running. He heard someone groaning in the street, near his house, went out, recognized deceased, and went for Samuel Steel, Sr., and the deceased was carried into his (witness') house, (where he died). W. E. Baker had been on road past Dr. Petin's house. Coming back, at some distance beyond Petin's, saw a man on dark horse, about one hundred and fifty to one hundred and seventy-five feet distant from the road, riding out of the road. Saw deceased's body on side of the road, opposite witness Rodriguez's house, but thought it was a drunken man. Afterward (during trial) measured distances as shown in note of Rivera's testimony, and also trailed horse track of rider he had seen from a point on the road, in a half circle, back to the road. Thomas A. J. Fountain helped to arrest defendant at the camp five miles from Las Cruces, west of Mesilla, and across the river. Arrest made early on morning of tenth. Defendant feeding his horses. Defendant denied having pistol, and witness found the thirty-eight caliber pistol in the "mess chest," etc. Robert P. Boone, foreman of the men who were "rounding up" cattle on west of river near Mesilla, and for whom defendant was working, testified that defendant left camp about noon for Las Cruces, riding a bay horse, and returned between 8 and 9 o'clock in the evening. Nothing unusual or excited in his manner. Talked with the boys for a few minutes, and went to bed. I. J. Hall, C. M. Foraker, Al. Hardin, and Perry Williams, for defense, had known defendant in Grant county, each for a term of two to nine years. Was of good character. Perry Williams knew that defendant could not speak Spanish language, and defense offered to prove by witness that witness Rivera told him that the man who "held

him up" carried on the full conversation in the Spanish language. Phoebus Campus, deputy sheriff, contradicts witness Fountain in unimportant details, and says that Anselmo Melendez, another deputy, found the thirty-eight caliber pistol in a pigeon hole in the top of mess chest, and not hidden. Defendant testifies that he was in Las Cruces, gambling. Was with witness Saens. Spoke to negro Frank, whom he knew, and asked for money, but it was a joke; and nothing thought of it. Left Las Cruces about 6 o'clock. Went toward railroad, and to Mesilla. Saw one or two persons on or near road. Did not see nor "hold up" witness Rivera. Did not see deceased. Did not know him. Was a stranger in Las Cruces. Did not speak Spanish language. Did not fire off pistol at all on the ninth. Arrived in camp about 8 or 9 o'clock. Went to bed after "talking with the boys," and was arrested while feeding the horses on morning of tenth. Witness Williams was not allowed to testify as to what Rivera told him.

No objections or exceptions are shown to testimony for prosecution, but this is waived here by solicitor general for the territory. After prosecution had closed, defendant arose in open court, and asked that additional counsel be assigned him. This was promptly done; R. L. Young being assigned to assist William Breeden, defendant's counsel. The jury returned a verdict of guilty, and a motion for a new trial was at once made, assigning usual grounds, and also separation of jury during trial, prejudice and ill feeling of citizens, rendering fair trial impossible; that defendant did not have a fair trial, and was prevented from asking change of venue because of fear of violence at hands of citizens; newly discovered evidence; refusal to admit testimony to rebut witness Rivera's evidence; error in allowing defendant to be brought into court manacled, and to be surrounded at all times by a large

body of armed men during trial, etc. Motion was overruled, and defendant sentenced to hang. Exception to overruling motion for new trial was taken, and case appealed.

Errors assigned and relied on here are practically embraced in that setting up the refusal of the court to grant a new trial. In support of this motion the MURDER: fair and defense and prosecution offered counter impartial trial: separation of affidavits as to separation of jury, and we jury: new trial. think it was affirmatively shown that defendant was not prejudiced by such separation, which appears to have been necessary. Defendant also offered to prove by Daniel M. Reade, upon new trial, that he, Reade, on evening of killing, at about 6 o'clock, saw a Mexican boy with a rifle, about one hundred yards from where deceased was found; and, coming back to Las Cruces at about 7 o'clock, heard a shot at or near said place. Defendant also offered affidavit of W. R. Fall, showing that feeling against defendant was so intense in Las Cruces that it was impossible, in opinion of affiant, for defendant to have had a fair trial by an impartial jury. William Breeden, counsel for defendant, made affidavit that he was called before a citizen's meeting, and told that they "would see that defendant had a fair trial, but that no continuance or change of venue must be had," that he did not ask for a continuance or change of venue because of fear of violence to his client at the hands of the citizens; and the court, in passing on the motion and affidavits, says: "That feeling, that excitement [of the citizens] was unquestionably sufficient at the time this person went to trial to grant a change of venue under our law, and I don't believe that there is a judge upon the bench, not even the judge of this court, who is interested because of relationship [with deceased], who would for a moment have hesitated to have given that change. * * * In my judgment, that opinion [as

expressed within affidavit of W. R. Fall] was well taken and given.''

It now becomes our duty, upon a full examination of the case and the law applicable thereto, to say whether the court, in the exercise of its discretion, erred in refusing a new trial. U. S. v. Lewis, 2 N. M. 463. And let us remember that ''the full protection and privileges of the law should be given to all men, and certainly should not be withheld from the weak, the poor, and the humble. The most hardened criminal, although we may believe him to be most guilty, has the same rights and privileges with us as the most innocent. If the defendant is guilty, he should be punished; but it should be done according to law.'' Mahl v. State, 1 Tex. App. 127. Article 6 of the amendments to the constitution of the United States provides: ''In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury   *   *   *   and to have the assistance of counsel for his defense.'' Mr. Justice Miller, after discussing the meaning and object of this provision, concerning an ''impartial jury of the state,'' says: ''The remaining provisions of this article are among the most important rights which are guarantied by the constitution.'' Miller, Const. 508. The provision of our constitution either means something, guaranties a substantial right, or it means nothing; and, as construed again and again by our highest courts, it confers upon a citizen, be it the most innocent person or the most hardened criminal, absolute rights of which he can not be deprived by statute or decision. One privilege is as absolutely conferred as the other. Nothing except violence can deprive the accused of either; and our courts are not founded upon violence, not guided by the demands or intimidated by the threats of mobs or vigilance committees, but stand ready to do justice under the law, with the constitution as the foundation stone upon which rests the entire superstructure.

Was the trial of this defendant a "fair and impartial trial" with such a feeling against him as justified the making of the affidavit alluded to and indorsed by the trial judge? He was arrested, hurried into trial, "defended" by counsel who was intimidated, as shown by his affidavit, and even more clearly shown by the record, from which we see that this counsel sat quiet without an objection, no matter what testimony was offered or error committed. This intimidation must have been apparent to those present, to the prisoner, and to the court, for we find the defendant upon the second day throwing himself upon the mercy of the court, and asking assistance in his defense, and the judge as promptly granting it; but this was after the prosecution had rested. Is it not evident that, instead of a free counsel, such as the constitution contemplated, there was here one skilled in the law, but afraid to use his skill; defending the accused not as a lawyer with the weapons of law; in name a counsel, in reality, not the substance, but the shadow, taking his cue from an enraged people, a power behind the hall of justice, an excited populace, justly frenzied by the perpetration of a foul murder, demanding a sacrifice for a sacrifice, a life for a life, stopping not for laws, for constitution, for sacred rights, for courts, bent on revenge? If the affidavits are true, with the jury which tried this man already in attendance upon court in Las Cruces, excitement intense, armed men guarding the manacled prisoner, his counsel intimidated, was not this the mere shadow of a trial, in reality a mockery of justice, the court but the vehicle for venting the wrath of an infuriated people? The statute law of this territory provides for change of venue, not in the discretion of the court, but as a matter of right, as absolute as the provision of a constitution; and yet, through intimidation, proven and not denied, the accused is

deprived of the right.  But there is another point to be considered: In Gifford v. People, 87 Ill. 210, it is held that "evidence of prior misconduct of the accused is never admissible in a criminal trial, except to prove prior malice toward an individual, or guilty knowledge." 1 Whart. Crim. Law, 639; Rosc. Crim. Ev. 97; 1 Phil. Ev. 765. See, also, Divine v. People, 100 Ill. 290. 1 Wharton, Evidence, section 29, says: "As a general rule, it is inadmissible, when the issue is whether A. did a particular thing, to put in evidence the fact that he did a similar thing at some other time. * * * The real issue would thus be obscured, and verdicts taken on side issues;" but, "if identity is disputed, it is admissible to prove that a person like the person charged was engaged about the same time in similar acts," and, "if an alibi is set up, it is relevant to prove that defendant at the time he is alleged to have been absent was present, perpetrating independent crimes."

*Prior misconduct of accused: evidence.*

It is not necessary to multiply authorities upon this well established rule, and yet we find here the witness Saens testifying before the jury of an attempt by defendant to "hold up" a negro at 2 o'clock in the afternoon.  For what purpose could this testimony have been offered?  Clearly only to prove a preconceived theory that the defendant killed the deceased for the purpose of robbery; and yet there is not one iota of testimony to show that the deceased was robbed; and, even had there been, to make it admissible it must first have been conceded that defendant was guilty, and only motive lacking.  This was error. If Rivera's testimony as to defendant's holding him up was admitted for the purpose of proving identity of accused, it was admissible.  It is proper to say that Judge John R. McFie, presiding judge of the third district, being disqualified, Judge Edward P. Seeds, of the first district, presided in the trial of this cause.  In

all the evidence upon the record it is manifest that it was an abuse of the discretion vested in the lower court to refuse a new trial, and hence judgment is reversed, and cause remanded.

O'Brien, C. J., concurs. Lee, J., concurs in the result.

Freeman, J. (dissenting).—In a cause like this, involving the life of a citizen, it is by no means a pleasant task to have to assign my reasons for not being able to agree with the judgment of a majority of this court, which reverses the verdict of guilty. The very able opinion of Associate Justice Fall does great credit to his ability as a lawyer, to his fine conceptions of justice, and his inclination to throw around the accused every possible protection accorded to him by law. With great respect, however, I can not but feel impressed with the conviction that the doctrine established by this opinion is fraught with danger to the peace of the commonwealth. The facts as they appear in this case are, I think, pretty fairly stated in the opinion of a majority of the court. They are substantially these: Between 6 and 7 o'clock P. M. on the ninth day of March, 1893, Samuel Steel, an amiable, industrious, and inoffensive young man, while engaged in delivering milk to his father's customers, in the town of Las Cruces, was shot, and fell from the seat of his delivery wagon, his horse running away. He was discovered in a dying condition, having been shot through the head. Upon information that attached suspicion to the defendant he was arrested. He was indicted, tried, and convicted within ten days from the date of the homicide. A motion in arrest of judgment and for a new trial having been overruled, he brings his case by proper proceedings to this court. There are numerous assignments of error, but a general assignment in overruling the motion for a new trial in

capital cases challenges the entire record, and invokes the consideration of the entire proceedings. The record discloses substantially the following case: About 12 or 1 o'clock on the day of the homicide the accused rode into the town of Las Cruces, put up his horse at the corral of one Albert Ellis. During the evening he was engaged in drinking and gambling. He was armed with a pistol. On passing along the street in company with one of his friends, a witness in the cause, he met a negro, and demanded money from him which demand not being complied with, he made a motion as if to draw his pistol. No assault, however, was made on the negro. He was afterward induced, however, to give up his pistol to the keeper of the saloon in which he had been drinking and gambling. Late in the evening, having recovered his pistol, he went to the corral, and ordered his horse, but, changing his mind about leaving town, he was induced to leave his pistol with the liveryman, and again he went out on the street. About 6 or 6:30 P. M. he came back to the livery stable, and having recovered his pistol, he mounted his horse, and rode out of town. Having proceeded to a certain point, he met the witness Rivera, whom he ordered in a peremptory manner to "hold up," and thereupon he demanded money from him. On being told by the witness that he did not have any money, he ordered the witness to disclose the contents of his pocket, which the witness did, offering him the only contents thereof, a knife, which was declined; and with a "whoop" he then rode on, leaving the witness to proceed on his way to town. In a few minutes thereafter a shot was heard in the direction taken by the accused. The shot was heard not only by the witness Rivera, but by witness Philipine Durier, who lived immediately on or near the street on which the homicide was committed. This witness also, immediately after the shot, heard the rumbling of a wagon, and

recognized the voice of the witness Baker, who testifies that on passing along the point in question, he saw a person whom he supposed to be drunk, but who proved to be the murdered man. She closed the front door of her house, and on the return of her husband, the witness Rodriguez, she informed him of what she had heard, and he, on going out, found Steel, then in a dying condition, lying near the corner, almost in front of his house. He had been seen to pass this house en route to deliver milk at the house of his father's customer, the witness Dr. Petin, had made the delivery, and started on his return to town, and was not seen again until found, as already related, in a dying condition. The accused was arrested on the morning following the homicide, at a distance of about five miles from the scene thereof, at the camp of a cattle outfit, in the employ of which he then was. He was interrogated as to the whereabouts of a pistol, which, as it was alleged by the officer, he had with him on the previous day. He denied having any such weapon, or that he had any such weapon on the previous day. A search being instituted, there was discovered under his pillow in his sleeping apartment a forty-five caliber pistol, and in a mess chest adjacent to his apartment a thirty-eight caliber pistol, which was identified by a number of witnesses as the identical weapon he wore on the day of the homicide. Two of the chambers had been recently loaded. He denied all knowledge of the homicide, which denial he persisted in on the witness stand. He denied not only any participation in the murder, but denied having heard any shot. He admitted, however, that on leaving town he pursued a certain route, which he attempts to describe, and which I think is shown by the other witnesses beyond any doubt to be the same as that on which the homicide was committed. A rude diagram was used on the trial below showing the railroad, the

streets, the acequias, and bridges over the same, and quite a number of landmarks, such as the house of Dr. Petin, where the deceased had delivered the milk, the house of Rodriguez, in front of which the body of the murdered man was found, etc. The witness Rivera also identifies, as nearly as he is able, the spot where he was held up by the accused; also the point which he had reached when he heard the shot. A copy of this diagram is certified to this court, and made a part of the record for our inspection. Taking the route pursued by the accused as testified to by the witness Rivera—which the accused himself does not deny—taking also the very point of time at which it was shown that the homicide was committed, and one circumstance is established, not only beyond any reasonable doubt, but beyond the possibility of a doubt. It is this: The accused was so near the scene of the murder that he could not have failed to hear the fatal shot. The uncontradicted evidence on this point is so conclusive that it must be treated as establishing this proposition. We have thus three important circumstances pointing to defendant's guilt, each of which is assailed by his evidence. He denied possession of a pistol, he denied meeting the witness Rivera, and he denied being sufficiently near the scene of the murder to hear the shot. The first and third circumstances are established by such an array of testimony as to place them beyond doubt, and the second by the testimony of the witness Rivera, whose testimony is uncontradicted, except by the accused himself. There is one other circumstance that must not be overlooked. A consideration of the diagram, showing roads, streets, etc., leading to and from the scene of the murder, and the relative situation of the witnesses at the time, while they do not absolutely preclude the possibility of the undetected presence of a third party, do nevertheless beyond any doubt demonstrate that

the accused was in a position to commit the crime, and that he was in such a position as to render it absolutely impossible that he could have failed to meet the deceased or the witness Rivera or to hear the shot. No attempt was made at the trial to account for the death of the deceased; the accused resting his defense alone on the simple denial, and on an effort to prove good character. On cross-examination he is made to disclose much of his previous history and his habits of life. He had roamed over the country seeking and obtaining here and there temporary employment, sometimes as a miner, at other times as a stockman. Firearms were his constant companions. He admits that he was once before in jail under a charge of murder, of which he says he was innocent, and for which he says he was not indicted. This is substantially all the evidence in the case. The jury returned a verdict of guilty. That the evidence was sufficient to support the verdict is not seriously controverted. The accused rests his cause for reversal upon alleged irregularities and errors intervening in the course of the trial. I shall pass now to their consideration.

There are assignments of error. Only three, however, are seriously relied on, and I will notice these in the inverse order of their supposed importance.

First. That the court excluded the evidence of one Perry, which was offered for the purpose of impeaching the testimony of Rivera, the witness who claimed to have been met and "held up" by the accused. The witness Perry is introduced to testify that Rivera, in speaking to him of the circumstance, said, that the order to him to hold up was given in Spanish, it being proposed to show that the accused could not speak Spanish. This testimony was clearly incompetent for any purpose. It was incompetent if offered to contradict the witness Rivera, because no foundation had been laid for it, and for any other

purpose it was wholly immaterial. Suppose that
Rivera did tell the witness Perry that the accused did
address him in Spanish, what then? What light is
thrown on the subject? There is nothing in the record
that contradicts this statement except the testimony
of the defendant himself, who swears, not that he did
not address the witness in Spanish, but that he did not
address him at all; did not meet or see him. True
enough, there is a feeble attempt to show that the
accused did not understand Spanish; but that he did
understand it sufficiently well to carry on the short,
crisp conversation detailed by the witness is not left in
any doubt. The proposed testimony of Perry was
therefore incompetent, and was properly excluded.

Second. The jury were allowed to separate after
the case had been submitted. It is shown by the testi-
mony that is not controverted, that the only separa-
tion consisted in allowing four of the jurors attended
by a bailiff, to attend a call of nature, the remaining
eight jurors remaining in charge of another bailiff. It
is shown by both of the bailiffs in charge that the jurors
were not talked to or otherwise interfered with. That
there was no error in this has been so often decided
that no room is left for argument.

Third. The matter, however, which it is supposed
vitiates this verdict is set out in the affidavit of Mr.
Breeden, the counsel for the accused. The substance
of the affidavit is that he, the attorney, had cause to
believe, and did believe, that the excitement occasioned
by the murder was so intense that any effort on his
part to secure a change of venue or postponement of
the trial would probably result in the exercise of
violence toward the accused, and probably endanger
his life. The proposition, as I understand it, may be
stated thus: The accused was entitled to the postpone-
ment of his trial or to a change of venue. He did not
ask for either, because his counsel was afraid to do so.

He was entitled, under the constitution, to a speedy trial. He was entitled to a trial in the county in which the offense was committed. He did not ask a continuance. He did not move for a change of venue. The court had no power to change the venue. He had his trial, and he now insists that his conviction was erroneous, because he obtained precisely what he was entitled to under the constitution. It will not be insisted that it was the duty of the judge to continue the cause without the consent of either party, or that he was authorized to change the venue, except on motion of the defendant himself.. The trial judge, in overruling the motion for a new trial, very properly says that if either of these motions had been made it would have been granted. The conclusion is reached, therefore, that, as the prisoner's attorney was by threats of violence prevented from making either of these motions, the prisoner has been deprived of the constitutional right of a fair trial. It is not attempted to be shown that he did not have a fair trial, but that, under the circumstances, he could not have had one. It is not pretended that any of the excitement or prejudice complained of entered the jury box, but that he was entitled, without motion, to a trial in another jurisdiction, and by another jury, and that he was deprived of this right by the threat of mob violence. This proposition, in my opinion, demands the most serious consideration before it is accepted as the law of the land. That it is novel is shown by the fact that it is unprecedented; and its adoption will, I fear, seriously undermine, if it does not destroy, the power of the courts to punish crime, and accomplish the very result which is sought to be avoided. I have not deemed it necessary to enlarge upon the right of every citizen charged with an offense to enjoy to its fullest extent the privilege of counsel, and of trial at the hands of a fair and impartial jury. We have long since passed

the period when it is possible to punish an innocent man. We are now struggling with the problem as to whether it is any longer possible to punish the guilty. Every safeguard that wisdom can suggest or experience improve has been invoked by the law. Every intendment and presumption is in favor of the accused. No matter though he may have lived a life of crime, an indictment raises the presumption of innocence. The law gives him compulsory process for witnesses, and the judge assigns him counsel if he has none. The jury are told to regard him as an innocent man, and every facility that the state can afford, and every device that legal acumen can suggest are placed at his disposal. He challenges the state to prove his guilt; and, though a thousand errors be committed in his favor, they are past recall. He enjoys, not only the fruits of all the mistakes that are made in his favor, but the mistakes that are made against him serve a still better purpose of vitiating a conviction. This is as it should be. It is this principle of our law that challenges the admiration of every lover of liberty. This is the palladium of our safety, and the bulwark of our freedom, and from no quarter should we permit it to be assailed. Nor do I think it necessary to animadvert on the danger to be apprehended from encroachments on this right of trial by jury. Nothing can be said in extenuation of mob rule. Its ultimate tendency is to anarchy. The authority of the law should, under any and all circumstances, be vindicated, and never more positively so than when invoked in favor of a party charged with an aggravated offense. Whenever courts abdicate in favor of the mob, they cease to be entitled to any respect. Nor should any extraneous influences be allowed to enter the temple of justice. But this is not a new doctrine. From time immemorial it has been received without question, and courts have been armed with plenary

power to enforce its provisions. The court can send its process to the uttermost recesses of its jurisdiction to summon impartial jurors (as was done in this case), and by fine and imprisonment punish any attempt to intimidate or corrupt them. This entire record exhibits the utmost fairness in the conduct of this trial, and is remarkably free from error. The judge of the local district being related to the murdered man, the judge of another district presided, and that, too, with a fairness and ability that challenges and defies criticism. The record shows that extraordinary care was exercised in the selection of jurors, and there is not even a suggestion that they were in anywise influenced by any improper motives. No application was made for a continuance or a change of venue, and it is admitted, therefore, that the court was not authorized either to continue the cause or to grant a change of venue. It would have been reversible error for the court to have changed the venue, for the defendant was entitled to a trial in the county in which the crime was committed. This was a constitutional right. He was entitled to the benefit of counsel, and this also he had in a double sense. He had a fair and impartial trial at the hands of a good and lawful jury. He had the benefit of having the law correctly charged, and was convicted on the testimony of witnesses who are unimpeached. A flood of light is shed on the real merits of this inquiry by the fact that of all the parties engaged on the trial below—the judge, the jurors, the attorneys for the defense, as well as the prosecution—there has not been presented for our consideration a single suggestion under oath of a doubt as to the appellant's guilt.

What, then, are the grounds upon which we are called upon to reverse the judgment? It is upon the sworn statement of his attorney that he was afraid to ask for a continuance or a change of venue (for, in my opinion, the affidavit of Mr. Fall, that, in his opinion,

the excitement created by the murder was so great as
to render it impossible to have a fair trial, can not be
looked to for any purpose).  This court can very well
presume that such a crime as the record shows to have
been committed would necessarily create great excite-
ment, and this is practically all that was set out in this
affidavit.  Conceding, therefore, as I do, freely and
fully, that the statements made by both of these affiants
were true, they show nothing more than that, in their
opinion, the excitement occasioned by the crime was
of such character as to render a fair trial impossible.
That great excitement vitiates a verdict where no con-
tinuance and no change of venue has been asked is a
proposition in criminal procedure so startling that it is
difficult to realize it.  Let us analyze it a moment.  A
homicide of doubtful character is committed.  The
party charged with the offense seeks a continuance.
The court overrules his motion, and on appeal to this
court he is told that such matters are peculiarly within
the discretion of a trial judge, and the judgment is
therefore affirmed.  Another homicide of the most
cold blooded and brutal character is committed.  The
party charged with the crime is arrested, tried, and
convicted.  He appeals to this court and the judgment
is set aside, because the trial judge did not do what he
was not asked to do, and what, therefore, he was con-
fessedly not authorized to do, to wit, change the venue.
I have said that this decision will go far to destroy the
power of the courts to enforce the criminal law.  Let
us see if this is not true.  Hereafter one of the most
important factors in procuring the escape of criminals
will be the manufacture of excitement.  Assuming that
the attorney's affidavit in this case is true, what then?
Is the author of an atrocious crime to be advised that,
after taking all the chances of a trial, he can get the
verdict set aside by showing that the people were so
much excited by the enormity of his offense that his

attorney was afraid to ask for a continuance? Grant
everything that is set out in these affidavits—that
there was great excitement, and that the attorney for
the defendant was afraid to ask for a change of venue
or for a continuance—what then? There is not a par-
ticle of proof that this excitement entered the jury box,
or that defendant was in anywise prejudiced thereby.
The judgment of reversal in this case seems to me to
establish this novel proposition, to wit, that when it is
shown that a cold blooded murder has been committed
the defendant is entitled to a speedy trial at the hands
of a jury, in order that he may escape the mob, and is
then entitled to a reversal in this court, to the end that
he may escape the jury. It is now a well settled prop-
osition of law that excitement is not of itself a sufficient
ground to support a motion for a continuance, even
where the continuance is asked for by the defendant.
The authorities on this proposition are numerous, but
I shall confine myself to a reference to but few of them.
I have selected some cases from the state of Georgia,
because I have found in none of the reports stronger lan-
guage in favor of guarding the accused against prejudice
growing out of undue excitement than is used by the
supreme court of that state in the case of Bishop v.
State, 9 Ga. 128, where the supreme court held that,
where a prisoner had been confined since his arrest,
and the crime had been recently committed, it was
good ground for continuance that the prisoner could
not go safely to trial on account of the excitement.
The court, in rendering the opinion, said: "And how
beautifully is this principle illustrated in that humane
provision of the British jurisprudence which, adjudg-
ing an attack on the king to be parricide against the
state, and that the jury and witnesses and even the
judges are the children, deem it fit on that account
that there should be a solemn pause before judgment—
a legal quarantine before trial—lest the mind should

be subject to the conclusion of partial and improper affections.   What a sublime spectacle of justice to witness this statutable disqualification of a whole nation for a limited period!"   I make this quotation showing the extreme jealousy with which the courts of that state guard the rights of the accused for the purpose of following it up with reference to other cases from the same state, which will demonstrate that the rule even there has never been regarded as reaching to the extent to which it is applied in this case. ·

In Thompson v. State, 24 Ga. 303, the court said that public excitement against the prisoner was not of itself sufficient cause of putting off the trial.   "It ought ever to be remembered in discussing a point like this that such is the benignity of the law, the jury always instructed by the court that if any reasonable doubt rests upon their mind of the guilt of the prisoner they should acquit him; and, further, that the court will not, in cases of a prisoner charged with the commission of a capital offense, allow a verdict to stand which could have been reached by a prejudiced jury only."   In the case of Thomas v. State, 27 Ga. 294, the same doctrine was announced in these words: "This court has never in any case held that public excitement alone was sufficient of itself to entitle the accused to a postponement of his cause."   And again, in the case of Brinkley v. State, 54 Ga. 373, the supreme court uses this language:   "True, there ought to be no unseemly haste.   Justice, although stern and unrelenting, may well be tempered with caution and calmness.   But certainly it is due to the public that a complaint of this character, to wit, that it is unable by reason of excitement to do justice to one charged with crime, ought to be made very clear by satisfactory proof under oath before it demands a hearing."   In the case of Jamison v. People, decided by the supreme court of Illinois, on the fifteenth of June of this year,

and reported at page 486, 34 N. E. Rep., the facts were substantially these: The accused presented to the court an application for a change of venue on account of the prejudice of the inhabitants of that county. He showed that the party with whose murder he was charged was a prominent citizen of the county, and a member of the board of supervisors; that the news of his death had spread over the entire county; that three daily newspapers, each having a large circulation, had published inflammatory statements in regard to the homicide; that the feeling of prejudice against him was so great that he feared he would be forcibly taken from the jail and hung by a mob; that the sheriff of the county was notified from time to time of the intention of the citizens to take the defendant from the jail, and hang him in defiance of law; that it was necessary for the sheriff to guard against the mob; that at about midnight of the twenty-ninth day of April, 1892, a large mob, composed of citizens of the county, went to the jail, and demanded the surrender of the prisoner. He introduced the affidavit of one George W. Register that he had heard as many as fifty persons, citizens of the county, say that the defendant ought to be hung, and that he believed the feeling in the county to be such that it would be impossible for the defendant to have a fair and impartial trial. Other affidavits of like character were introduced, and yet, upon a counter showing made by affidavits of three hundred and seventy-seven citizens of the county, the motion for a change of venue was overruled, and the supreme court of that state affirmed this action of the trial court. It must not be overlooked that the cases to which I have referred grew out of application made by the defendant. I have cited no case of the application of the rule in the absence of any such motion for the reason that, if any such doctrine has ever heretofore been announced, I am not aware of it.

It is insisted for the defendant that the court below erred in permitting the testimony of the witness Saens as to the alleged assault on the negro to go to the jury. It is insisted that on a charge of murder committed upon one person it is incompetent to show an assault made upon another person at a different time and place. Ordinarily, this would be true. I think, however, that under the circumstances of this case the court did not err in permitting this testimony to go to the jury. I think it was competent to be introduced as one of the links in the chain of circumstantial evidence going to show the defendant's guilt. It shows his frame of mind. It exhibits the character of man that he was. He was drinking; he was armed; he was out of money; and his attack on the negro, followed very shortly thereafter by his attack on Rivera, followed up in a few minutes thereafter by his attack on the deceased, are all intermingled as shades that make up the perfect photograph of a continuous scene of debauchery and crime. In the case of People v. Harris, decided by the court of appeals of the state of New York, January 17, 1893, and reported at page 65, vol. 33, No. 1 N. E. E. Rep., this language is used: "It may be remarked, in connection with this evidence from the witnesses Latham and Oliver, that, while evidence merely to show previous bad and vicious character is inadmissible against one on trial for the commission of a criminal offense, if the depraved acts offered to be shown evidence or throw a light upon motive, they become admissible."

Recurring once more to the principal contention on the part of the counsel for the appellant,—that the condition of the public mind rendered a fair trial impossible, and a motion for a change of venue or a continuance dangerous,—there are some additional observations that I think are pertinent. It will be admitted, I think, that the position assumed is an

extraordinary one, and that the occasion to warrant the application of this singular doctrine should be shown to be extraordinary; for if we once ingraft upon the criminal practice of this country the doctrine that a conviction otherwise fair and proper must be set aside because of undue haste, are we not inviting the very danger that we are seeking to avoid? One of the strongest pretended justifications of mob rule is found in the charge that the courts fail to do their duty; that crime goes unpunished. It is impossible for this court to close its eyes to the fact that in this territory there is a growing sense of insecurity for life; and this very sense of insecurity has been brought about by the unpunished crime of such men as the record discloses this defendant to be. And this brings me to a discussion of some of the facts in this case as they bear upon the character of the defendant and the nature of the crime. It needs nothing more than the testimony of the defendant himself to disclose even to a reviewing court the character of the man. Let us contemplate for a moment the picture that he draws of himself. He came to this country ten years ago, at the age of eighteen years. Since that time he has led a wandering life in this and the territory of Arizona, vibrating between the two territories and the state of Texas. He has never resided long at any one given point. He is unable to state the number of the places at which he has resided within the last ten years. In defiance of law he has made a constant practice of going armed. He has been at least once before in jail under a charge of murder. On the day of the homicide he was in town armed, drinking and gambling. He had lost nearly all of his money, and, while walking down the street with his companion, "we meets this colored boy on the corner, and during the time me and this Mexican had been talking about what we would do for some money." (This is his precise language.)

He orders the negro in a joking way to give up his money. When arrested, he denies every material fact testified to except this encounter with the negro. That he swore falsely about the pistol is not denied. That he swore falsely when he said he did not hear the fatal shot can not, under all the uncontradicted testimony, be for a moment doubted. That he swore to a falsehood in stating that he did not meet either the deceased or the witness Rivera is not susceptible of a doubt. And that he would have sworn falsely about his threatened robbery of the negro if it had not already been testified to by his companion and friend, does not admit of a doubt. This man's testimony not only fails to support the hypothesis of his innocence, but affords the very strongest corroborative evidence of his guilt. His effort to establish a good character by the testimony of his friends is to my mind not only a failure, but is an unfortunate corroboration and emphasis of the impression created by his own testimony. Of the four witnesses called to establish his reputation, two of them, Foraker and Hardin, testified that his reputation was that of a man who was in the habit of going armed; the third (Hall) had known him about two years, had seen him going armed; and the fourth (Boone) had never heard his reputation spoken of one way or the other. The record shows this man to belong to a race of men now happily almost extinct; men who have made this country in the recent past a dark and bloody ground; men who seek the saloon and the gambling house with the same instinct that the wolf seeks his den. Given a character of this sort, excited by drink, depressed by poverty, armed, and out of employment, and you have the typical highwayman. I am prepared to admit that his assault on the negro was a half-drunken joke, that his "hold up" of Rivera was a matter of amusement, and I think it more than probable that the flash of his pistol in the face of

young Steel was intended to alarm, rather than to kill, him; but if there is anything in the record of this case that invokes the extraordinary clemency of this court I confess that I have been unable to discover it.